In re Sophia C.Y. WU, Debtor.

Edward F. TOWERS, Trustee, Appellant,

v.

Sophia C.Y. WU, Appellee.

BAP No. NC–93–1161–PeMeG.
Bankruptcy No. 91–3–1244–TTC.
Adv. No. 92–3–559–TTC.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 19, 1994.

Decided Oct. 24, 1994.

Christopher Alliotts, San Francisco, CA, for appellant.

Harold W. Fryday, Santa Clara, CA, for appellee.

Before PERRIS,[1] MEYERS and GREENWALD,[2] Bankruptcy Judges.

## OPINION

PERRIS, Bankruptcy Judge:

The Chapter 7 trustee filed an adversary proceeding seeking to recover certain renewal commissions paid to the debtor postpetition. The bankruptcy court denied the trustee's motion for summary judgment and granted the debtor's motion for summary judgment, determining that the renewal commissions represented earnings from postpetition services of the debtor that were not property of the estate under 11 U.S.C. § 541(a)(6).[3] We AFFIRM in part, REVERSE in part and REMAND for further proceedings consistent with this Opinion.

## FACTS

The debtor, Sophia C.Y. Wu, has been employed as a "career agent" by State Mutual Life Assurance Company of America since 1983 under Career Agent's Agreements executed on October 21, 1983 and June 8, 1988. As a career agent for State Mutual, the debtor is responsible for selling insurance and annuity policies. Section 12 of the Career Agent Agreement obligates State Mutual to pay to the debtor while the agreement

---

1. Honorable Elizabeth L. Perris, Bankruptcy Judge for the District of Oregon, sitting by designation.

2. Honorable Arthur M. Greenwald, Bankruptcy Judge for the Central District of California, sitting by designation.

3. All section references are to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, unless the context otherwise indicates.

is in force, commissions on first year and renewal premiums paid to State Mutual on insurance and annuity policies sold by the debtor.[4]

The debtor filed a Chapter 7 petition on March 29, 1991. From the commencement of the bankruptcy case through August 31, 1992, State Mutual paid the debtor $50,472.56 in renewal commissions for policies sold prepetition.[5]

The Chapter 7 trustee, Edward F. Towers, filed an adversary proceeding seeking to avoid the payment of the postpetition renewal commissions under section 549(a) and to recover the value of these payments under section 550(a). On cross-motions for summary judgment, the bankruptcy court determined that the renewal commissions were not property of the estate because the payment of the commissions depended upon postpetition services by the debtor and the commission payment structure adopted by the Career Agent Agreement reflects that the renewal commissions are allocated to services performed postpetition. The trustee filed this timely appeal from the order denying his motion for summary judgment and granting the debtor's motion for summary judgment.

## ISSUE

Whether the postpetition renewal commissions for insurance policies sold prepetition are property of the estate under section 541.

## STANDARD OF REVIEW

We review an order on a motion for summary judgment *de novo*. *See In re Burns*, 974 F.2d 1064, 1065 (9th Cir.1992). "Viewing the evidence in the light most favorable to the nonmoving party, the appellate court must determine whether the bankruptcy court correctly found that there was no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *In re Martin*, 161 B.R. 672, 675 (9th Cir. BAP 1993) (quoting *In re Baird*, 114 B.R. 198, 201 (9th Cir.1990)). The interpretation of a statute is a question of law that we also review *de novo*. *See In re Quintana*, 915 F.2d 513, 515 (9th Cir.1990).

## DISCUSSION

■ An "estate" is created when a bankruptcy petition is filed. *See* §§ 301, 302, 303 & 541(a); *In re FitzSimmons*, 725 F.2d 1208, 1210 (9th Cir.1984). Section 541(a)(1) states that the estate is comprised of all legal or equitable interests of the debtor in property as of the petition date with certain limited exceptions. In sections 541(a)(2)–(7) Congress identified six specific classifications of what constitutes property of the estate.

■ Section 541(a)(6) provides that the bankruptcy estate includes the "[p]roceeds, product, offspring, rents, and or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." This case requires us to determine whether the postpetition renewal commissions are included within the scope of the postpetition earnings exception contained in section 541(a)(6).

■ While the Ninth Circuit has not addressed the question of postpetition renewal commissions, it has addressed section 541(a)(6) in situations involving postpetition earnings that arise, at least in part, out of prepetition services or prepetition property. In *In re FitzSimmons*, 725 F.2d 1208 (9th Cir.1984), the court determined that while the earnings exception of section 541(a)(6) applied in the Chapter 11 case of a debtor engaged in a law practice as a sole proprietor, it did not remove all of the postpetition earnings of the law practice from the estate. The court held that the earnings exception

---

4. Sections 13 and 14 of the Agreement also obligate State Mutual to pay certain "Quality Fees" and "Additional Quality Fees" on the renewal premiums applicable to the third and subsequent years of insurance policies.

5. The record is not clear as to whether these were payments of commissions on renewal premiums under Section 12 of the agreement or quality fees under sections 13 and 14 of the agreement. The consistent characterization by the parties of these payments as "renewal commissions", however, suggests that they were payments under section 12 of the agreement and they will be treated as such for purposes of this Opinion.

applies only to the those earnings generated by services personally performed by the individual debtor postpetition. 725 F.2d at 1211. To the extent postpetition earnings are not attributable to such personal services but to the business' invested capital, accounts receivable, goodwill, employment contracts with the firm's staff, client relationships, fee agreements, or the like, the earnings are property of the estate. *Id.*

In *In re Ryerson*, 739 F.2d 1423 (9th Cir. 1984), Ryerson and Farmers Insurance Company entered into an agreement which appointed Ryerson to a district manager position and which provided that in the event of cancellation or termination of the appointment, Farmers would pay "contract value" to Ryerson. Ryerson was ultimately terminated several months after he filed a Chapter 7 petition and he sought a declaratory judgment that the $18,588 in "contract value" was not property of the estate. The court rejected the contention that the estate had no interest in the "contract value" because Ryerson had not yet been terminated at the time he filed bankruptcy and his right to contract value was therefore unvested and contingent. 739 F.2d at 1425. Because Ryerson's right to contract value was property of the estate, the court determined that any payments pursuant to that right were property of the estate, even though paid postpetition. The court indicated that the test of whether such postpetition payments are property of the estate is whether such payments are "sufficiently rooted in the pre-bankruptcy past" and concluded that under that test, the termination payments "representing value for years of service competed prior to bankruptcy, and not being an arbitrary amount arising after bankruptcy," are property of the estate. 739 F.2d at 1426.

Several courts in other jurisdictions have specifically addressed whether postpetition renewal commissions are property of the estate. In order to determine this question, these courts have generally focused upon the rights and obligations of the debtor pursuant to the employment agreement and whether the receipt of the commissions was dependent upon the performance of postpetition services. *See, In re Tomer*, 128 B.R. 746, 762 (Bankr.S.D.Ill.1991), *aff'd*, 147 B.R. 461, 472–73 (S.D.Ill.1992); *In re Bluman*, 125 B.R. 359, 365–66 (Bankr.E.D.N.Y.1991); *In re Froid*, 109 B.R. 481, 483 (Bankr.M.D.Fla. 1989); *In re Palmer*, 57 B.R. 332, 334–35 (Bankr.W.D.Va.1986); *In re Sloan*, 32 B.R. 607, 610–11 (Bankr.E.D.N.Y.1983); *In re Kervin*, 19 B.R. 190, 193–94 (Bankr.S.D.Ala. 1982). Where a debtor's postpetition services were not necessary to generate the renewal commissions because the terms of the contract continued to pay renewal commissions in the event that the debtor terminated the contract or died, courts have found the renewal commissions to be property of the estate. *See Tomer* and *Froid.* Where, however, the contract required a debtor to remain employed by the insurer and to service the existing policies or perform certain other services in order to receive the renewal commissions, courts have found that postpetition services were necessary to generate the renewal commissions and the commissions were not property of the estate. *See Palmer*, 57 B.R. at 335; *Kervin*, 19 B.R. at 193–94.

The opinions addressing the renewal commissions are helpful in analyzing whether postpetition services are necessary for renewal commissions under a given contract. These cases, however, make the entire analysis turn upon the presence of a requirement of postpetition services. Under these cases, if there is such a requirement, all of the renewal commissions will be excluded from the estate. If there is not such a requirement, then all renewal commissions will be included in the estate.

This all or nothing approach is inconsistent with *FitzSimmons* and *Ryerson*, which, in evaluating earnings having both a prepetition and a postpetition component, caution us to determine the extent to which the earnings are attributable to prepetition property or prepetition services. The proper analysis under *Ryerson* and *FitzSimmons* is to first determine whether any postpetition services are necessary to obtaining the payments at issue. If not, the payments are entirely "rooted in the pre-bankruptcy past", *Ryerson*, 739 F.2d at 1426, and the payments will be included in the estate. If some postpetition services are necessary, then courts

must determine the extent to which the payments are attributable to the postpetition services and the extent to which the payments are attributable to prepetition services. That portion of the payments allocable to postpetition services will not be property of the estate. That portion of the payments allocable to prepetition services or property will be property of the estate.

In this case, the bankruptcy court essentially followed this analysis. It determined that because the contract required that the debtor remain employed and provide a fixed amount of new business in order to receive renewal commissions, the case is similar to *Kervin, supra,* in that postpetition services are required. The court then determined that, although it is difficult to allocate the renewal commissions to prepetition or postpetition efforts, the manner in which the contracts in question provide for most of the commission to be paid in the initial year of the policy and a much smaller percentage to be paid in subsequent years reflects an allocation of the renewal commissions to the postpetition services required to generate renewals. The bankruptcy court determined, therefore, that judgment for the debtor would be consistent with *Ryerson.*

The bankruptcy court is correct that the contract required the debtor to remain employed in order to receive renewal commissions. Section 15 of the Career Agent Agreement provides that no commissions or fees will be payable unless the agreement is in effect on the date the payment is due. An exception to this, however, is that commissions will continue to be paid if the agreement terminates by reason of the death, disability or retirement of the agent.[6]

It is not clear, however, that the agreement required the debtor to provide a fixed amount of business to receive renewal commissions. Section 17 of the agreement gave either party the right to terminate the agreement whether or not it had been breached, by giving 30 days written notice. Section 17 further provided that State Mutual expects to exercise its right to terminate the agreement "if and when the total of new paid-for individual life, annuity and health insurance annual premium effected by or through Career Agent in any two consecutive calendar years prior to his retirement ... is less than the minimum required to qualify for Additional Quality Fee under Exhibit A as then in effect."

While this provision gives State Mutual the right to terminate the agreement for any reason, it suggests that State Mutual will not exercise this right because of an agent's lack of productivity, unless the inadequate productivity continues for two calendar years. If the debtor's productivity had been above the threshold level before she filed her petition, any lack of productivity on the part of the debtor would not have led to her termination under this provision until the passage of two calendar years with inadequate sales. Arguably, the debtor could have sold no additional policies for the first two years after her bankruptcy and State Mutual would not have terminated her agreement under this provision thereby extinguishing her right to renewal commissions. The debtor received the renewal commissions at issue within two

**6.** Section 18 of the agreement provides, in pertinent part, as follows:

If this agreement terminates:
(i) by reason of the death of Career Agent; or
(ii) by reason of the permanent and total disability of Career agent; or
(iii) by reason of retirement of Career Agent under State Mutual's Career Agents' Pension Plan; or
(iv) by reason of employment of Career Agent by State Mutual in some capacity other than Career Agent or by any of its affiliates,
without breach of any of its provisions by Career Agent, first year and renewal commissions will continue to be paid to Career Agent as if this Agreement had not terminated, except that no commissions will be paid on premiums paid after the date Career Agent, without prior consent in writing of State Mutual, becomes employed by, or a representative of, any other insurer offering coverage in competition with State Mutual....

Section 19 of the agreement provides, in pertinent part, as follows:

If this Agreement terminates by reason of the death or permanent and total disability of Career Agent without breach of any of its provisions by Career Agent, Quality Fees will continue to be paid to Career Agent on renewal premiums applicable to the third through tenth policy year....
(E.R.Ex. 5 at 4).

years after the filing of her bankruptcy petition. If her prepetition sales had been at the required level, the contract would not have required continued productivity during the initial two year postpetition period in order to receive the renewal commissions. Because there is no evidence before us as to whether the debtor met this level before she filed her petition, we cannot determine that the contract required a fixed amount of new business as a condition to receiving renewal commissions.

Apart from the contract, however, there is evidence to suggest that the renewal commissions required postpetition services. The declaration of Thomas A. Pierce, Jr., states that the production of a required amount of new business is a requirement for receiving renewal commissions and that State Mutual expects agents, in their own interest, to contact insured's to help collect past due premiums. The deposition testimony of Leon Ialeggio indicates that agents are required to service their clients. In addition, in attributing the renewal commissions to postpetition efforts, the bankruptcy court relied upon the structure of the commission arrangement, whereby a commission of 50% is paid on the first year's premium with 12%, 10% and 5% for the renewal premiums in policy years 2–4 respectively and a 2% quality fee on renewal premiums for the third and subsequent policy years. The bankruptcy court indicated that this commission structure reflects that most of the work is performed in obtaining the policy and the lower commission in later years reflects the lesser amount of work required in servicing the policies. The inference apparently drawn by the bankruptcy court is that the renewal commissions are paid to compensate the agent for the work in servicing the policy and they reflect earnings attributable to postpetition services rather than earnings "rooted in the pre-bankruptcy past."

There is, however, conflicting evidence. As discussed above, the contract on its face does not require postpetition services. In addition, the trustee points to evidence that renewal premiums are procured through the efforts of State Mutual rather than agents such as the debtor.

While the evidence and the inferences to be drawn from the evidence may weigh more heavily in support of a conclusion that postpetition services were required for the renewal commissions, the evidence on this question is unclear and conflicting. In light of the principle that we must view the evidence in a light most favorable to the nonmoving party and that we should draw any justifiable or reasonable inferences in favor of the nonmoving party, *see Martin,* 161 B.R. at 675, we determine that there is a disputed factual issue as to whether the debtor's postpetition efforts are required for the receipt of the renewal commissions. If postpetition services are required, there is also a disputed issue of material fact on the question arising under *Ryerson* and *FitzSimmons*—to what extent are the earnings properly allocable to postpetition and/or prepetition efforts of the debtor.

## CONCLUSION

Whether and to what extent the renewal commissions are excluded from the estate depends upon whether the debtor's postpetition services are a prerequisite to the right to the renewal commissions and, if so, the extent to which the commissions are attributable to the postpetition services as opposed to prepetition services. When we view the evidence in the light most favorable to the nonmoving party, there are genuine issues of material fact as to both of these questions. Summary judgment, therefore, is improper.

Based upon this analysis, we AFFIRM the bankruptcy court's order to the extent that it denies the trustee's motion for summary judgment, we REVERSE the bankruptcy court's order to the extent that it grants the debtor's motion and we REMAND for further proceedings consistent with this Opinion.