**In re George SCHMITZ, Debtor.**

**Kenneth W. BATTLEY, Plaintiff,**

**v.**

**George R. SCHMITZ, and William C. Sliney, Defendants.**

**Kenneth W. BATTLEY, Plaintiff,**

**v.**

**George R. SCHMITZ, Defendant.**

**Bankruptcy Nos. A92–00274–
HAR, 97–3211, 97–3008.
Adversary No. A92–00274–004–HAR,
A92–00274–003–HAR.**

United States Bankruptcy Court,
D. Alaska.

July 28, 1998.

William D. Artus, Artus & Choquette, Anchorage, AK, for Battley.

Cabot Christianson, Gary A. Spraker, Bundy & Christianson, Anchorage, AK, for Schmitz.

Robert P. Crowther, Sole Practitioner, Anchorage, AK, for Sliney.

## MEMORANDUM DECISION GRANTING PARTIAL SUMMARY JUDGMENT THAT DEBTOR'S IFQ/QS RIGHTS WERE PROPERTY OF THE ESTATE

HERBERT A. ROSS, Bankruptcy Judge.

### Contents

Page
1. *INTRODUCTION* ........................................................... 118
2. *FACTUAL AND PROCEDURAL BACKGROUND* ........................... 118
3. *ISSUE* ...................................................................... 120
4. *LEGAL ANALYSIS* ...................................................... 120
 4.1. *Overview of Relevant Part of 11 USC § 541* ........................... 120
 4.2. *Contention of the Parties* ............................................ 121
 4.3. *Effect of Postpetition Contingencies* ................................. 121
 4.4. *Alaska Cases Involving IFQ/QSs* ..................................... 123
 4.5. *The IFQ/QSs Were Property of the Estate Under the Facts* ............. 124
5. *CONCLUSION* ............................................................. 124

1. *INTRODUCTION*– George Schmitz filed a chapter 7 bankruptcy in *April* 1992. He had fished for sablefish in 1988 through 1990. This qualified him for fishing rights pursuant to regulations of the National Marine Fisheries Services adopted in *November* 1992, after a lengthy administrative review.

Were the fishing rights property of the bankruptcy estate based on Schmitz's prepetition fishing activities, or not because there were no regulations in effect when he filed for bankruptcy? I find that the fishing rights were property of the estate.

2. *FACTUAL AND PROCEDURAL BACKGROUND*– George Schmitz fished for sablefish in 1988 through 1990. As a result, he qualified to acquire certain limited entry or restricted fishing rights called Quota Shares (QSs) and Individual Fishing Quotas (IFQs) under federal regulations promulgated by the National Marine Fisheries Services.

On April 7, 1992, Schmitz filed a chapter 7 bankruptcy. This was between the time he did the qualifying fishing (during 1988–1990) and the implementation of the regulations on November 3, 1992. Prior to the deadline in June 1994, Schmitz filed a timely IFQ application.[1] Schmitz did not disclose the potential fishing rights on his bankruptcy schedules, nor did he notify the trustee after the fact that he was applying for or had acquired the IFQ/QSs.

The IFQ/QSs were awarded to Schmitz in 1996.[2] He sold some of the rights to a third party on May 13, 1997, for $2,205.00.[3] The balance of the rights were sold to his brother-in-law, George Sliney, a defendant in this adversary proceeding. Sliney resold them to another third party for $44,360.50.[4]

The trustee filed these adversary proceedings, seeking a declaration that the IFQ/QS rights were property of the estate. He also seeks to recover $2,205.00 from Schmitz for the first sale, and $44,360.50 from both Sliney and Schmitz for the sale to Sliney.[5] He also seeks to revoke Schmitz's discharge. The trustee had attempted to head off the sale of the IFQ/QS rights, but apparently did not properly serve an adversary proceeding on Schmitz in time to accomplish this.

---

1. *Affidavit of George Schmitz*, Docket Entry 35 at page 3, ¶ 7, filed February 27, 1998.

2. *Id.* at page 2, ¶ 3, and page 4, ¶ 13.

3. *Id.* at page 5, ¶ 17.

4. *Id.* at page 4, ¶ 15, and page 5, ¶ 19.

5. *Id.* at page 5, ¶ 20.

Cross-motions for summary judgment were filed: (a) by Schmitz for a declaration that the IFQ/QSs were not property of the estate, and (b) by the trustee that they were. Sliney supports Schmitz's position. Schmitz also seeks to dismiss the trustee's suit to revoke his discharge if the court rules that the IFQ/QSs were not property of the estate.

The trustee outlined the background of the legislation and regulations implementing the IFQ/QS program, including the fact that the North Pacific Fishery Management Council had recommended the IFQ/QS program in December 1991.[6] The history is also discussed in a 9th Circuit case [7] and the Alaska Supreme Court case of *Ferguson v. Ferguson:* [8]

> The IFQ program is a federal regulatory response to various problems in the halibut and sablefish fisheries, including allocation conflicts, discard mortality, safety, and economic stability. Pacific Halibut Fisheries; Groundfish of the Gulf of Alaska; Groundfish of the Bering Sea and Aleutian Islands; Limited Access Management of Fisheries Off Alaska, 58 Fed.Reg. 59,376 (1993). In the interest of promoting "the conservation and management of halibut and sablefish resources," the program replaces the previous "open access" regulatory regime with a limited access system. *Id.* To qualify for an IFQ, a person must have owned or leased a vessel that made fixed gear landings of halibut or sablefish during 1988, 1989, or 1990. 50 C.F.R. § 676.20(a)(1)(i) (1994). Once people qualify, their initial "quota shares" are determined in proportion to their history of landings from 1984 to 1990 for halibut, and from 1985 to 1990 for sablefish. 50 C.F.R. § 676.20(b) (1994).

The summary judgment briefs relate the following legislative and regulatory background:

- The IFQ/QSs had their inception with the Magnuson Fishery Conservation and Management Act of April 1976.[9]
- The North Pacific Fishery Management Council was established to manage fisheries in the Pacific Northwest, including Alaska and its surrounding waters.[10]
- The Council was required to submit a fishery management plan for this area.[11]
- The fishery management plan envisioned the establishment of a limited entry fishery using a system like the IFQ or QS programs to obtain an optimum yield. In the process of developing a plan, a Final Supplemental Environmental Impact Statement for the Individual Fishing Quota Management Alternative for Fixed Gear Sablefish and Halibut Fisheries for the Gulf of Alaska and the Bering Sea/Aleutian Islands (FEIS) was issued.[12]
- The FEIS, which is dated September 15, 1992, indicates that on December 8, 1991, the North Pacific Fishery Management Council recommended the IFQ program for the management of fixed gear sablefish and halibut fisheries off the Alaska coast, among other places in the Pacific Northwest.[13]
- The Secretary of the Commerce proposed regulations.[14] The proposed sablefish IFQ regulations were adopted in November 1992,[15] and final regulations in November 1993.[16]

**6.** *See, Memorandum in Support of Opposition to Motion for Summary Judgment and Trustee's Cross Motion for Summary Judgment, I. Overview and Time Line,* at pages 2–7, Docket Entry 41, filed April 22, 1998.

**7.** *Alliance Against IFQs v. Brown,* 84 F.3d 343 (9th Cir.1996) (J. Kleinfeld), *cert. denied,* —— U.S. ——, 117 S.Ct. 1467, 137 L.Ed.2d 681 (1997).

**8.** 928 P.2d 597, 598 (Alaska 1996).

**9.** Codified, as amended, at 16 U.S.C. § 1801, et seq.

**10.** 16 U.S.C. § 1852(a)(1)(G).

**11.** 16 U.S.C. § 1852(h)(1).

**12.** Exhibit 1 to the trustee's *Memorandum In Support of Opposition to Motion for Summary Judgment and Trustee's Cross Motion for Summary Judgment,* Docket Entry 41, filed April 22, 1998.

**13.** *Id.,* Exhibit 1 at page 8, ¶ 1.1.

**14.** 16 U.S.C. § 1853(b)(6).

**15.** 57 Fed.Reg. 49676 (November 3, 1992).

**16.** 58 Fed.Reg. 59375 (November 9, 1993).

The trustee states that an IFQ/QS program was a "done deal" in April 1992, when Schmitz filed bankruptcy, even though the form of the implementing regulations was finalized postpetition.

At oral argument on the summary judgment motions, the parties agreed that the court need not consider issues such as non-bankruptcy law anti-alienation provisions. The parties were not aware of any restriction on a bankruptcy trustee applying for IFQ/QS rights based on the qualification of a chapter 7 debtor.

3. *ISSUE*– Were the IFQ/QSs property of the estate because the qualifying fishing years of 1988–1990 preceded the bankruptcy, or not because the implementing regulations were adopted postpetition, even though there was substantial administrative activity prior to the bankruptcy to adopt a limited entry fishery and the implementing regulations?

4. *LEGAL ANALYSIS*–

4.1. *Overview of Relevant Part of 11 U.S.C. § 541*– In adopting the 1978 Bankruptcy Code, Congress intended to define what was property of the estate in broad, inclusive terms under 11 U.S.C. § 541(a)(1).[17] Section 541(a)(1) provides:

(a) The commencement of a case under section 301, 302 or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

What is property of the estate is usually determined on the petition date.[18] *Collier on Bankruptcy* states:

The most significant limitation in determining the scope of property of the estate is one of timing. Under section 541(a), and with a few enumerated exceptions, the bankruptcy estate consists of all of the debtor's legal and equitable property interests that existed as of the commencement of the case, that is, as of the time that the bankruptcy petition is filed. In addition, the estate, itself, may acquire property after the date of the filing of the petition that also constitutes "property of the estate" under section 541(a). [footnote omitted] [19]

Property law varies from state to state, and generally a bankruptcy court must determine those rights, including an analysis of whether property belongs to the bankruptcy estate, by reference to state law, barring some overriding federal interest.[20] So, we should look to the law of Alaska in determining the rights *vis-a-vis* the IFQ/QSs, subject, of course, to any peremptory federal property rules.

Section 541 has some statutory exceptions built into its framework. For example, the earnings from personal services by an individual debtor, after the commencement of the case, are not property of the estate.[21]

And, § 541(a)(5) includes in the definition of property of the estate certain types of inheritance, marital settlements, or life insurance benefits acquired within 180 days after the petition is filed. None of the three categories included in § 541(a)(5) encompasses the type of property involved in this case, IFQ/QS rights acquired with the benefit of debtor's years of working in the fishery,

---

17. 5 *Collier on Bankruptcy* at ¶ 541.01 (Matthew Bender 1998); *In re Chappel*, 189 B.R. 489, 493 (9th Cir. BAP 1995), citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 2314, fn. 9, 76 L.Ed.2d 515 (1983).

18. *In re Wu*, 173 B.R. 411, 413 (9th Cir. BAP 1994).

19. 5 *Collier on Bankruptcy* at ¶ 541.02 (Matthew Bender 1998).

20. *In re Rega Properties, Ltd.*, 894 F.2d 1136, 1139 (9th Cir.1990) (quoting *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)), *cert. denied*, 498 U.S. 898, 111 S.Ct. 251, 112 L.Ed.2d 209 (1990); *In re Kimura*, 969 F.2d 806, 810 (9th Cir.1992).

21. 11 U.S.C. § 541(a)(6); 5 *Collier on Bankruptcy* at ¶ 541.17; 11 U.S.C. § 546(a)(6) (Matthew Bender 1998); *In re Swanson*, 36 B.R. 99, 100 (9th Cir. BAP 1984).

which occurred before the petition, plus the benefits of a regulation adopted postpetition.

Property of the estate includes the profits, rents or proceeds of property of the estate, except, as has been noted, the postpetition earnings of an individual. So, if the estate includes rental property owned by a debtor at the petition date, the postpetition rent payments also become property of the estate.[22]

4.2. *Contention of the Parties*– Schmitz raises three points:[23] (a) that Schmitz held no legal right or interest in the IFQ/QSs on the petition date; (b) that the IFQ/QSs do not fall within the specific language of § 541(a)(5); and (c) that the IFQ/QSs were not proceeds of property of the estate. Schmitz and Sliney would like to focus on the effective date of the regulations, postpetition, to indicate that on the petition date there was no property of the estate for the trustee to acquire with respect to what ultimately became IFQ/QSs.

Schmitz cites *In re Harrell*[24] which held that the Phoenix Suns were not contractually obligated to renew the account of a debtor who was a season ticket holder and, therefore, the right was speculative and not property of the estate.

The trustee would like to focus on the prepetition qualifying years in 1988 through 1990. He argues that Schmitz's qualification status *is* the property right. He contends that this, combined with the ultimate adoption of regulations that were in process at the time of the bankruptcy, give the right to claim the IFQ/QSs as property of the estate.

The trustee does not argue that the facts fall within the specific statutory language of § 541(a)(5), and instead claims that the IFQ/QSs are the fruits of prepetition rights.

The trustee emphasizes the breadth of the property of the estate under § 541(a)(1). He notes that property need not be transferable or subject to process to be part of the bankruptcy estate.[25] He also notes that the conditional, future, speculative, or the equitable nature of a property interest does not prevent it from becoming property of the estate.[26]

4.3. *Effect of Postpetition Contingencies*– This adversary proceeding presents a close issue which the courts have rarely, if ever, addressed—the implementation of a postpetition law giving life to prepetition qualifying or enabling events. Neither the parties nor the court have been able to find a case on point and, therefore, we have to work with some more remote analogies involving § 541.

If a debtor has rights which accrue prepetition, but only come into fruition based on a postpetition contingency, those rights are generally declared to be property of the estate. For example, in *In re Ryerson*,[27] a debtor, Ryerson, had been employed prepetition with an Arizona insurance company. On the petition date, he had a contingent right to a separation benefit in an amount known as the "contract value." The "contract value" vested after a full year of employment and, if Ryerson was in good standing on the date of his termination and not guilty of certain specified misconduct, he was entitled to a set amount.

After Ryerson filed a chapter 7 bankruptcy, he terminated on good terms and was entitled to the contract value. The issue was whether the contract value was property of the estate. The 9th Circuit panel concluded that the "contract value," although contingent on the petition date until his later termination, was still property of the estate.[28]

---

**22.** *Id* at ¶ 541.17; 11 U.S.C. § 546(a)(6).

**23.** Plaintiff's *Motion for Summary Judgment*, Docket Entry 34, filed February 27, 1998, at pages 8–13.

**24.** 73 F.3d 218 (9th Cir.1996).

**25.** Trustee's *Memorandum in Support of Opposition to Motion for Summary Judgment and Trustee's Cross Motion for Summary Judgment*, Docket Entry 41, filed April 22, 1998, at page 8, citing *Matter of Geise*, 992 F.2d 651, 655 (7th Cir.1993).

**26.** *In re Anders*, 151 B.R. 543 (Bankr.D.Nev. 1993).

**27.** 739 F.2d 1423 (9th Cir.1984).

**28.** *Id*, at 1425.

The court noted that even though there was a contingent nature to the payment, it was substantial enough to be considered property of the estate.[29]

The panel said:

> Under the Act, the test was whether the after-acquired property was "sufficiently rooted in the prebankruptcy past and so little entangled in debtor's ability to make a fresh start that it should not be excluded from property of the estate."[30]

This indeed defines the broad issue in our adversary proceeding—whether, under the total facts, the rights acquired in the IFQ/QSs were rooted in the bankruptcy past, such that they should be included in property of the estate. *Ryerson* is an easier case than ours based on the fact that the contract was entered into prebankruptcy, but it shares some analogy to our adversary proceeding because the fruition relied on uncertain post-petition occurrences.

*In re Neuton*[31] adopted the reasoning of *In re Ryerson*. The debtor, Laurence Neuton, filed a chapter 7 bankruptcy. At the time he filed bankruptcy, his mother was the beneficiary of a trust which was to pay the mother "a share of the trust income during her lifetime, and a share of trust income to her living children after her death."[32] The mother died about a month-and-a-half after the petition was filed and the trustee claimed a portion of the trust income as property of the estate. Neuton argued that because his interest was in future income, he had no interest in the property at the commencement of the case. The court said:

> Whether a debtor's contingent interests are acquired by the bankrupt estate was a thorny issue under the old Bankruptcy Act. In a landmark decision, which largely inspired the new code, the supreme court

held that "the term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoinment must be postponed."[33]

*Neuton* concluded that contingent interests of the type involved in that case are typically held to be property of the estate.

Schmitz relies on *In re Schmitt*,[34] a 9th Circuit BAP decision which held that *Neuton* was distinguishable, in part because *Schmitt* involved a revocable trust, whereas *Neuton* involved an irrevocable trust. Marie Schmitt filed a chapter 7 bankruptcy. On the petition date in February 1994, she was a contingent beneficiary of a trust established by her aunt and uncle. The trust provided that when the first of the settlors died, Ms. Schmitt would be entitled to $10,000 worth of United Parcel Service stock. The uncle died in December 1994. The trustee sought to acquire the shares as property of the estate and the debtor resisted. The parties agreed to settle for $2,000 and a creditor objected.

The issue in *Schmitt* was whether the settlement was properly allowed under 9th Circuit guidelines.[35] This led to the trial court's analysis of the legal position of the trustee against Ms. Schmitt regarding whether the shares were property of the estate. In distinguishing *In re Neuton*, the BAP held that the fact that the trust in *Schmitt* was revocable was "highly significant."[36] I cannot find where the *Neuton* court ever identified the trust in that case as "irrevocable," and see little basis for the BAP distinguishing it from *Neuton* and *Ryerson*.

*Schmitt* relied in part on *In re Harrell*,[37] a case that Schmitz cites in support of his position that the IFQ/QSs were a mere "expectancy," and not property of the estate. In *Harrell*, the debtor owned season tickets

---

**29.** *Id*, at 1425, fn. 1.

**30.** *Id*, at 1426, citing *Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966).

**31.** 922 F.2d 1379 (9th Cir.1990).

**32.** *Id*, at 1381.

**33.** *Id*, at 1382, citing *Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966).

**34.** 215 B.R. 417 (9th Cir. BAP 1997).

**35.** *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988).

**36.** *In re Schmitt*, 215 B.R. at 421.

**37.** 73 F.3d 218 (9th Cir.1996).

to the Phoenix Suns basketball games. The Suns said they usually allowed season ticket holders to purchase playoff tickets and renew their season tickets, but specified that the opportunity to renew was a "privilege" granted by the Suns and could be withdrawn at the Suns' discretion. The Suns said they would make a reasonable effort to maintain renewal privileges, but would not guarantee the opportunity. The trustee tried to sell the debtor's season tickets, playoff tickets, and the opportunity to renew season tickets. The 9th Circuit panel concluded that the opportunity to renew season tickets was not a property right under Arizona law.

While I am generally bound by the authority of a 9th Circuit opinion, I believe *Harrell* is inconsistent with prior circuit opinions on the same subject. It is in conflict with *Ryerson* and *Neuton*. *Ryerson* and *Harrell* both concerned the state law of Arizona. Technically, *Harrell* could not overrule *Ryerson*, since one 9th Circuit panel cannot overrule another panel, but the first panel must be overruled by an *en banc* decision.[38]

Nonetheless, *Harrell* held that the rights of renewal were only an expectancy and, therefore, concluded that they were not property of the estate. To be consistent with prior case law, *Harrell* should have held the rights of renewal *were* property of the estate, even though the property might have minimal value. Either the Suns would or would not have acknowledged the right to renew. If they did, the rights would have been valuable. If they did not, the property would have been of no benefit to the estate. This presents more of a state law contract question about whether the Suns could be forced to sell or not under Arizona law, and not a bankruptcy question of whether the renewal rights were property of the estate.

A more reasoned approach regarding the effect of postpetition contingencies is found in *In re Wu*.[39] The issue was whether postpetition insurance renewal commissions were property of the estate. The BAP held that the portion of the postpetition commissions which were not attributable to personal services so as to be excluded by 11 U.S.C. § 546(a)(6), but rather arose from the invested capital of the business, its staff, goodwill, accounts receivable, client relations, etc., were property of the estate. This bears some resemblance to the Schmitz situation, where no qualifying fishing activity was required postpetition.

The question is can the postpetition adoption of regulations be equated to the postpetition continuance of the insurance business (its staff and business presence) in *In re Wu?* Although Schmitz presents a closer question, *Wu* is some authority for holding the IFQ/QSs are property of the estate.

*Wu* was apparently decided with reference to California law, the site of the dispute. Since the IFQ/QSs are related to Alaska, it is important to review the Alaska law relating to them.

4.4. *Alaska Cases Involving IFQ/QSs*— The Alaska courts have issued several rulings involving property interests in IFQ/QSs. *Ferguson v. Ferguson*[40] involved the question of whether the IFQ for halibut and sablefish was property subject to division, because it was marital property. The Fergusons were married in December 1988. The husband fished during the qualifying IFQ years, 1988–1990. The Fergusons separated in December 1993. The superior court divided their property in a divorce proceeding held in October 1994. The case does not state whether the application had been filed or the IFQ rights granted as of December 1993.

The husband permit holder argued that the IFQ conveyed no property rights in fishery resources. While acknowledging that the court could not divide a fishery resource, it held that the division of the IFQ rights was not the fishery resource, but something in the nature of a limited entry permit or license. The court found that there was a

---

38. *Murray v. Cable National Broadcasting Co.*, 86 F.3d 858, 860 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 689, 136 L.Ed.2d 613 (1997).

39. 173 B.R. 411 (9th Cir. BAP 1994).

40. 928 P.2d 597 (Alaska 1996).

124

divisible marital property right in the IFQs themselves.[41]

The second Alaska Supreme Court case, *Johns v. Johns*,[42] bears a closer factual analogy to our adversary proceeding. The issue was whether IFQs were marital property subject to division. The Johns were married in September 1984, and separated in October 1993. The husband, Greg, fished during the IFQ qualifying years for sablefish, 1988–1990. The court said:

> Although Greg [the husband] applied for and received his IFQ shares after the parties had separated, the parties remained married during 1988, 1989, and 1990, the qualifying years for participation in the IFQ program .... Nevertheless, while Greg concedes that IFQs may be considered marital property, he argues that the "marital character" of the IFQs should not be determined simply based upon whether the parties were married during the qualifying years. Greg's rationale is that his participation as a commercial fisher is lifelong, extending before his marriage to Betty Jo, and that Betty Jo reaped the benefits of his fishing while the parties were married such that the IFQs do not represent "any sort of marital gain or loss."
>
> Greg's IFQ eligibility is based not upon his "lifelong participation" in the halibut and sablefish fisheries, but upon the work he performed during his marriage to Betty Jo. As the trial court noted, in order to fish during the qualifying years for IFQs, Greg expended marital assets and efforts, and Betty Jo is entitled to share in the benefits received from these efforts.[43]

The husband in *Johns* applied for his IFQs after the separation, which can be analogized to Schmitz applying after the bankruptcy petition date. *Johns* held that there was a sort of property interest inherent in the IFQs from the husband having fished during the qualifying years.

The Schmitz case is a closer call because the regulations were not in effect on the petition date, whereas they were when the Johns separated. Nonetheless, *Johns* lends support to the concept that the qualifying years created a property right.

*4.5. The IFQ/QSs Were Property of the Estate Under the Facts–* The broad question is whether the IFQ/QSs are so rooted in Schmitz's prebankruptcy past that they should be included as property of the estate.[44]

Given the ongoing federal activity to implement a limited entry fishery in sablefish at the time Schmitz filed bankruptcy in April 1992, and the advanced stage in bringing that to fruition, as reflected in the FEIS and the history described by the trustee, I conclude that the IFQ/QSs were tied to Schmitz's prepetition qualifying rights from the 1988–1990 fishing seasons. The IFQ/QS rights were "rooted" in Schmitz's prebankruptcy past.

*Johns v. Johns,* on similar facts found that the IFQs were marital property. The qualifying rights are the essential property interest, and the IFQ/QSs were the "profit" or fruit of those rights. Had the trustee applied as the owner of those rights, he would have qualified for the IFQ/QS rights himself. Based on this, the IFQ/QS rights which Schmitz obtained were property of the estate.

*5. CONCLUSION–* The trustee's motion for partial summary judgment to declare that the IFQ/QSs were property of the estate will be granted by a separate order, and Schmitz's motion that they were not will be denied. As a result, Schmitz's motion that his discharge should not be revoked based upon the IFQ/QSs not being property of the estate will also be denied.

---

41. *Id,* at 599–600.

42. 945 P.2d 1222 (Alaska 1997).

43. *Id* at 1226.

44. *See, Segal v. Rochelle,* previously cited in footnotes 30 and 33.