United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 27, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

))))))))))))))))))))))))))))

No. 04-30189

))))))))))))))))))))))))))

In the Matter of:

EDWARD KEITH BURGESS,

Debtor.

_____

EDWARD KEITH BURGESS,

Appellant,

v.

LUCY G. SIKES,

Appellee.

---

Appeal from the United States District Court
for the Western District of Louisiana

---

Before JONES, Chief Judge, REAVLEY, JOLLY, HIGGINBOTHAM, DAVIS,
SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES,
STEWART, DENNIS, CLEMENT, PRADO, and OWEN, Circuit Judges.[*]

EDWARD C. PRADO, Circuit Judge:

This is a bankruptcy case. The issue is whether a crop-disaster-relief payment authorized by legislation enacted after the debtor filed for bankruptcy is property of the bankruptcy estate. A panel of this court held that it is not, following

---

[*]Judge King did not participate in the decision.

which the court voted to consider the case en banc.  After hearing argument and considering supplemental briefing by the parties as well as law professors serving as *amici curiae*,[1] a majority of the court agrees with the panel decision. Accordingly, we reverse the judgment of the district court.

## I.

The facts are short and undisputed.  Farmer Edward Keith Burgess filed a Chapter 7 bankruptcy petition in August 2002.  He was discharged from bankruptcy in December 2002.  In February 2003, the Agricultural Assistance Act of 2003 ("the 2003 Act") was enacted.  That legislation provided for crop-disaster-relief payments to qualifying farmers for 2001 or 2002 crop losses.

Qualifying farmers could begin applying for disaster payments in June 2003.  Burgess did so, and in August 2003, after Burgess's bankruptcy case was closed, the Farm Service Agency of the Department of Agriculture mailed a check for $24,829 to the trustee of Burgess's bankruptcy estate.  The purpose of this payment was to compensate Burgess for crop losses sustained in 2001.

The bankruptcy case was reopened to determine what to do

---

[1] The amici are professors Susan Block-Lieb; Ralph Brubaker; S. Elizabeth Gibson; Jonathan C. Lipson; Charles W. Mooney, Jr.; Theresa J. Pulley Radwan; Nancy B. Rapoport; Robert K. Rasmussen; and Robert M. Zinman.  The amici's brief was prepared as a class project in the Bankruptcy LL.M. Program at St. John's University School of Law.

with the check. Burgess filed a Motion for Turnover, which was denied by the bankruptcy court. The district court affirmed, both courts concluding that the payment was property of the bankruptcy estate and belonged to Burgess's creditors.

A panel of this court reversed. *Burgess v. Sykes (In re Burgess)*, 392 F.3d 782, 786 (5th Cir. 2004). The panel reasoned that the disaster payment was not "property" under 11 U.S.C. § 541(a)(1) because the legislation providing for the payment was not enacted until after Burgess filed for bankruptcy. *Id.* at 786. According to the panel, since Burgess "had no legal or equitable right to [the] payment absent such legislation," "[he] had no legal or equitable right to [the payment] at the commencement of [his] bankruptcy case." *Id.* at 786–87.

The panel also held that the payment was not "proceeds" of property under § 541(a)(6). *Id.* at 787. Proceeds must derive from property of the estate, and here Burgess had none. *Id.* Without property, there could not be proceeds. *Id.* Accordingly, the panel reversed the judgment of the district court. *Id.*

The court ordered rehearing en banc to determine whether the disaster payment at issue in this case constitutes property within the meaning of § 541(a)(1) or proceeds within the meaning of § 541(a)(6). Holding it is neither, we again reverse the judgment of the district court.

II.

Whether money is property of the debtor or the bankruptcy estate is a question of law reviewed de novo. *See State Farm Life Ins. Co. v. Swift (In re Swift)*, 129 F.3d 792, 795 (5th Cir. 1997) (deciding de novo whether legal causes of action belonged to the debtor or to the estate). In this case, two subsections of § 541 potentially bring Burgess's disaster-relief payment into his bankruptcy estate. Section 541 of the Bankruptcy Code broadly defines "property of the estate" as "all . . . property, wherever located and by whomever held." 11 U.S.C. § 541(a) (2004). Subsection (1) specifies that property of the estate includes "[a]ll legal or equitable interests of the debtor in property *as of the commencement of the case*." § 541(a)(1) (emphasis added). Subsection (6) further provides that "proceeds . . . of or from property of the estate" also come into the bankruptcy estate. § 541(a)(6).

Thus, the scope of § 541 is broad: that section brings into the estate all of the debtor's legal and equitable interests "wherever located and by whomever held." § 541(a)(1). However, the Code also provides a temporal limitation: property of the estate is determined at "[t]he commencement of the case." *Id.*[2]

---

[2] *See also Ohio v. Kuvacs*, 469 U.S. 274, 285 n.12 (1985) ("The commencement of a case under the Bankruptcy Code creates an estate . . . ."); *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 243 (5th Cir. 1988) ("The filing of a petition for reorganization under Chapter 11 of the Code creates an estate.").

4

The case is commenced, and the estate created, when the bankruptcy petition is filed. *See In re Swift*, 129 F.3d 792, 795 (5th Cir. 1997); 5 COLLIER ON BANKRUPTCY ¶ 541.02 (15th ed. rev. 2005). Section 541's temporal limitation is the key to deciding this case.

III.

The trustee and the amici (collectively, "the Appellees") argue that Burgess's disaster-relief payment comes into the bankruptcy estate through a combination of § 541(a)(1) (property) and § 541(a)(6) (proceeds). Specifically, they advance the following arguments to support the inclusion of the disaster-relief payment in Burgess's bankruptcy estate. First, they argue that Burgess's crop loss gave him a contingent interest in the postpetition disaster-relief payment. As such, they claim that the contingent interest constitutes property of the estate, making the disaster-relief payment proceeds of that property. Second, the Appellees argue that Burgess's crop loss, itself, is property of the estate supporting the inclusion of the payment as proceeds under a straightforward application of § 541(a)(1) and (a)(6).

Because the Bankruptcy Code defines property of the estate in terms of "legal or equitable interests of the debtor" that exist "as of the commencement of the case," *id.* § 541(a)(1), the question we must decide is temporal: when did Burgess acquire a

5

legal interest in the disaster-relief payment?  In other words, did the crop loss itself entitle Burgess to the money?  Or was it the combination of Burgess's crop loss and the enactment of the 2003 Act that gave him that interest?  If it was the former, then Burgess acquired the interest before bankruptcy, and the payment is part of his estate.  But if it was the latter combination of events that gave Burgess an interest in the payment, he did not acquire that interest until after bankruptcy; and the disaster-relief payment belongs to Burgess.  For the reasons that follow, we hold it was the latter.

## A.

The Appellees first argue that Burgess had a contingent interest in the payment at the time of bankruptcy pursuant to *Segal v. Rochelle*, 382 U.S. 375 (1966).  They claim that this interest is property of the estate, bringing the postpetition payment into the estate as proceeds.

In *Segal*, the debtors filed for bankruptcy in September 1961.  *Id.* at 376.  "After the close of that calendar year, loss-carryback tax refunds were sought and obtained from the United States on behalf of [the debtors] under Internal Revenue Code § 172."  *Id.*  The losses had been suffered prior to the debtors filing for bankruptcy in September 1961; they were carried back to the years 1959 and 1960 to offset net income earned in those years.  *Id.*  The question before the Supreme Court was whether

6

this refund was property of the bankruptcy estate under § 70a(5) of the Bankruptcy Act,[3] the predecessor to § 541(a)(1) of the Bankruptcy Code. *Id.*

"Property," as used in § 70a(5), was not defined in the Bankruptcy Act;[4] therefore, according to *Segal*, the dual purposes of the Bankruptcy Act governed the definition of property under pre-Code law. *See id.* at 379. The first goal of the Bankruptcy Act was "to secure for creditors everything the bankrupt may possess . . . when he files his petition." *Id.* To achieve that goal, property was construed to include interests that are novel, contingent, or the enjoyment of which must be postponed. *Id.* The second goal of the Act was to "leave the bankrupt free after the date of his petition to accumulate new wealth in the future." *Id.* The inquiry under this prong was whether the interest was

---

[3] Section 70a(5) of the Bankruptcy Act read in pertinent part,

> (a) The trustee of the estate of a bankrupt . . . shall . . . be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is property which is held to be exempt, to all of the following kinds of property wherever located . . . (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon or sold under judicial process against him, or otherwise seized, impounded, or sequestered . . . .

11 U.S.C. § 110(a)(5) (1964), *quoted in Segal*, 382 U.S. at 377 n.1.

[4] *See Segal*, 382 U.S. at 379 ("[I]t is impossible to give any categorical definition to the word 'property.'" (quoting *Fisher v. Cushman*, 103 F. 860, 864 (1st Cir. 1900))).

7

"sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property' under § 70a(5)." *Id.* at 379–80.

The Court held that in light of these considerations, the debtors' refund was property of the bankruptcy estate. *Id.* at 381. According to the Court, the first question was whether "on the date the bankruptcy petitions were filed, the potential claims for loss-carryback refunds constituted 'property.'" *Id.* at 379. The Court answered this question in the affirmative by examining the circumstances that existed "at the time [the] bankruptcy petitions were filed." *Id.* at 380. Two circumstances that "point[ed] towards realization of a refund" were that "taxes had been paid on net income within the past three years[] and the year of bankruptcy at that point exhibited a net operating loss." *Id.* In addition, the tax law that provided for the refund was enacted before the debtor filed for bankruptcy.[5] Thus, at the time of filing, the debtors had a claim for a refund—a legal interest—regardless of when the money was actually paid. *See*

_____

[5] *See Drewes v. Vote (In re Vote)*, 276 F.3d 1024, 1026 (8th Cir. 2002) ("[T]he law authorizing the tax refund [in *Segal*] predated the bankruptcy fling."); *Bracewell v. Kelley (In re Bracewell)*, 322 B.R. 698, 704 (M.D. Ga. 2005) ("While *Segal* does not specifically address the issue, it seems as though the tax laws providing for the loss-carryback tax refunds had been enacted prior to the *Segal* debtor filing his bankruptcy petition.").

8

*id.* at 380. Next, turning to the second prong of the property

inquiry, the Court concluded that the debtors' claim for a refund

was indeed rooted in the prebankruptcy past and not entangled

with their ability to make a fresh start. *Id.* Accordingly, the

Court held that the claim for a refund was property of the

bankruptcy estate within the meaning of § 70a(5) of the

Bankruptcy Act. *Id.* at 381.

Because Burgess's crop loss occurred before bankruptcy, the

Appellees argue that the Supreme Court's "sufficiently rooted"

test supports classification of the payment as property of the

estate. In other words, they claim that Burgess's interest in

the disaster payment is "sufficiently rooted in [Burgess's] pre-

bankruptcy past and so little entangled with [his] ability to

make an unencumbered fresh start that it should be regarded as

'property' under [§ 541]," *id.* at 380. We reject this argument

for two reasons.

First, although Congress has specifically approved of

*Segal*'s result,[6] *Segal*'s "sufficiently rooted" test did not

survive the enactment of the Bankruptcy Code. As this court

previously explained in *Goff v. Taylor*,

> The Bankruptcy Code was intended to create a more uniform
> and comprehensive scope to "property of the estate" which

---

[6] *See* 11 U.S.C. § 541 (West 2004) (Historical and Statutory
Notes) (Revision Notes and Legislative Reports 1978 Acts) ("The
result of [*Segal v. Rochelle*], is followed, and the right to a
refund is property of the estate.").

9

is subject to the reach of debtors' creditors than had previously existed under the old Bankruptcy Act. Under Section 70(a) of the earlier Act, the inclusion of an asset within the estate varied in accordance with (1) an individual examination of the legal nature of the asset (2) in light of the purposes of the Bankruptcy Act. This two part test reflected the dual and often conflicting policies woven into the Act. These policies were to secure for the benefit of creditors everything of value the bankrupt might possess in alienable or leviable form, but to permit a bankrupt to accumulate new wealth after the date of his petition and to allow him an unencumbered fresh start. Relying upon these competing considerations, the Supreme Court developed a rule that where property "is sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start . . . it should be regarded as 'property' [of the estate]."

*The enactment of the Bankruptcy Code undertook to obviate this analytical conundrum. Under Section 541 of the Code, all property in which the debtor has a "legal or equitable interest" at the time of bankruptcy comes into the estate.*

706 F.2d 574, 578 (5th Cir. 1983) (internal citations and footnotes omitted) (emphasis added), *overruled on other grounds by Patterson v. Shumante*, 504 U.S. 753 (1992). Section 541 now governs what is considered property of the bankruptcy estate, and unlike former § 70a(5) of the Bankruptcy Act, § 541 expressly defines property: "All legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. Thus, under current law, a debtor's interest in property may be contingent——or enjoyment of the interest may be postponed——until after bankruptcy, but the debtor must have had a prepetition legal interest nonetheless.

Second, *Segal* is distinguishable because the debtor did have

10

a prepetition legal interest in that case.  At the time of bankruptcy, § 172 of the Internal Revenue Code gave the debtor a *claim* for a tax refund if certain conditions were met.  It was the combination of the law and the conditions made legally relevant by the law that conferred on the debtor a prepetition legal interest: the claim for a refund.  In that way, the *Segal* debtors' claim for a refund is similar to the prepetition accrual of a cause of action that results in a postpetition judgment in the debtor's favor.  In such cases, the debtor's cause of action is a prepetition legal interest——§ 541(a)(1) property——that brings the postpetition judgment into the estate as proceeds under § 541(a)(6).  *See, e.g.*, *Wieburg v. GTE Southwest Inc.*, 272 F.3d 302, 306 (5th Cir. 2001) (holding that causes of action for age and sex discrimination that arose prepetition were property of the bankruptcy estate).

Here, by contrast, Burgess suffered the crop loss before filing for bankruptcy, but he did not have a prepetition claim to, or interest in, the disaster-relief payment because the legislation authorizing the payment had not yet been enacted.  If Burgess had no right or interest that constituted property within the meaning of § 541(a)(1) at the commencement of the case, then the payment he later received cannot be proceeds of property of the estate under § 541(a)(6).  Two other courts have recently reached the same conclusion in the context of federal disaster-

relief payments to farmers.

In *In re Vote*, the Eighth Circuit distinguished *Segal* in holding that similar disaster-relief payments were not property of the estate under § 541(a)(1). *Drewes v. Vote (In re Vote)*, 276 F.3d 1024, 1026–27 (8th Cir. 2002).[7] The facts of *Vote* are indistinguishable from this case.

Vote could not plant a crop in 1999 because the soil was saturated. *Id.* at 1026. In September 1999, Vote filed a Chapter 7 bankruptcy petition. *Id.* In October 1999, Congress passed legislation compensating qualifying farmers for 1999 crop losses. *Id.* The next month, Vote began receiving disaster-relief payments pursuant to this legislation. *Id.*

The Eighth Circuit rejected the trustee's argument that the payments were property of the bankruptcy estate under *Segal*, stating,

> *Segal* is distinguishable. . . . [U]nlike the Appropriations Act in the present case, the law authorizing the tax refund predated the bankruptcy filing. Thus, the *Segal* debtor possessed an existing interest at the time of filing, whereas Vote had a mere hope that his losses might generate future revenue. . . .
> The trustee cites a number of cases that follow the rule in *Segal*. In each of those cases, however, there

---

[7] The trustee in *Vote* did not raise its § 541(a)(6) argument in the district court, and thus the court of appeals refused to consider it. *Vote*, 276 F.3d at 1027. Although Appellees here do make their *Segal* argument under § 541(a)(6) (operating in conjunction with § 541(a)(1)), this distinction does not change our analysis of the issue.

12

> existed a readily discernible legal interest at the time of filing. Some arose from statutes, some from contracts, and some from lawsuits, but all conferred upon the debtors interests with some potential value, even though those interests may have been only contingent. In contrast, before Congress passed the Appropriations Act, Vote had no interest of any kind.

*Id.* at 1026–27.

One district court recently followed *Vote* in a similar case, *In re Bracewell*,[8] reaching the same result. *Bracewell* considered whether a disaster payment created by the 2003 Act was property of the estate where the debtor converted his Chapter 12 case to a Chapter 7 case before the legislation was enacted. *Id.* at 701.[9]

The *Bracewell* court explained that "once crop disaster legislation is enacted, legally significant facts exist upon which a farmer could base a contingent right, which is the same type of contingent right contemplated under *Segal*." *Id.* at 706–07. However, the mere hope that the legislation will be enacted does not create a contingent interest in the debtor. *Id.* at 707. The court explained,

---

[8] *Bracewell v. Kelly (In re Bracewell),* 322 B.R. 698 (M.D. Ga. 2005).

[9] The timing of the conversion from Chapter 12 to Chapter 7 was significant in *Bracewell* because in a Chapter 12 case, § 1207 expands the definition of property of the estate to include § 541-type property that the debtor acquires after the commencement of the case but before the case is closed or converted to a Chapter 7 case. 11 U.S.C. § 1207(a)(1). In this case, Burgess filed his petition under Chapter 7. Chapter 7 contains no comparable provision to § 1207. *See* 11 U.S.C. §§ 701–900. Thus, here, the critical time remains the date of filing.

13

> Without the crop disaster legislation, growing crops and suffering crop loss . . . are of no legal significance and create no right. . . . Indeed it is the crop disaster legislation that makes growing and suffering certain crop losses relevant by attaching new legal consequences to events completed before the legislation's enactment. Consequently, this is not the type of contingency contemplated by *Segal* . . . .

*Id.*

The necessity of a prepetition legal interest has also been reaffirmed in post-*Segal* cases decided in other, comparable contexts. *Schmitz v. Battley (In re Schmitz)*, 270 F.3d 1254 (9th Cir. 2001), and *Hoseman v. Weinschneider*, 277 B.R. 894 (N.D. Ill. 2002), *aff'd on other grounds*, 322 F.3d 468 (7th Cir. 2003), are two such examples.

The debtor in *Schmitz* was an Alaskan fisherman of halibut and sablefish. *Schmitz*, 270 F.3d at 1255. He filed for bankruptcy in April 1992. *Id.* Seven years prior to Schmitz's bankruptcy, "the North Pacific Fisheries Management Council, an agency of the Department of Commerce, had been considering the implementation of a quota-based fisheries management plan for halibut and sablefish caught off the Alaskan coast." *Id.* Proposed regulations had been promulgated by the time Schmitz filed for bankruptcy, but the final regulations implementing the plan were not published by the Secretary of Commerce until November 1993, nineteen months after Schmitz filed. *Id.* The regulations became effective in January 1994. *Id.*

14

Pursuant to the final regulations, "the plan called for qualified fisherman to apply for and be awarded Quota Shares ('QS') and Individual Fishing Quotas ('IFQ'), an annual catch limit applicable to [future] fishing, based on the total weight of a fishermen's legal landing of sablefish and halibut during the so-called 'qualifying years' of 1988–1990." *Id.* (citing 50 C.F.R. § 676.20(b) (1994)). Schmitz filed his QS/IFQ application in 1994, but his QS/IFQ allotment did not become final until 1996. *Id.* at 1255–56. "At last, in December 1996, over four and one-half years after Schmitz filed his bankruptcy petition, he was issued two QS/IFQ certificates for 41,478 units and 1,815 units of halibut, respectively." *Id.* at 1256.

In January 1997, Schmitz "conveyed the larger QS/IFQ to Appellant William Sliney in exchange for some crab pots." *Id.* Sliney then resold the allotment to a third party for approximately $44,000. *Id.* Schmitz also sold the smaller allotment to another party for approximately $2,000. *Id.*

In June 1997, the trustee sought to reopen Schmitz's bankruptcy proceeding, claiming that the QS/IFQ allotments were property of the estate and seeking to recover the $2,000 from Schmitz and $44,000 from Sliney. *Id.* The bankruptcy court agreed that the allotments were property of the estate and awarded the money to the trustee:

> The bankruptcy judge ruled that in light of the "ongoing federal activity to implement" a sablefish management

15

> plan "and the advanced stage in bringing that to fruition" at the time Schmitz filed his bankruptcy petition——even though the plan had not yet been adopted——"the IFQ/QSs were tied to Schmitz's prepetition qualifying rights from the 1988–1990 fishing seasons. The IFQ/QS rights were 'rooted' in Schmitz's prebankruptcy past."

*Id.* The Bankruptcy Appellate Panel affirmed the bankruptcy court's grant of partial summary judgment in favor of the trustee. *Id.*

The Ninth Circuit reversed, holding that the QS/IFQ allotments "were not property of the bankruptcy estate because the regulations creating them were not adopted until after the bankruptcy petition was filed." *Id.* The *Schmitz* court began its analysis as we did in this case, by looking to the Bankruptcy Code's definition of property of the estate: "all legal or equitable interests of the debtor in property *as of the commencement of the case*." *Id.* at 1256–57 (quoting 11 U.S.C. § 541) (emphasis in original). The court determined that Schmitz did not have a property interest in the QS/IFQs on the date of bankruptcy, explaining,

> On the date that Schmitz filed his petition, he might have had a hope, a wish and a prayer that the Secretary would eventually implement the plan then under consideration. However, the fact remains that as of the date of the petition, Schmitz's 1988–1990 catch history had no value. At most, there existed the possibility that his prior catch record *might* be relevant *if* a fishing quota program were ever adopted in a form favorable to him, *if* his application for such rights were granted, and *if* he could successfully defend against any competing challenge to his application. This sort of nebulous possibility is not property.

16

*Id.* The *Schmitz* court then discussed and approved of the Eighth Circuit's decision in *Vote*, observing, "Schmitz, the fisherman, is in the same boat [as the debtor in *Vote*]. . . . [Neither's] expectation [rises] to the level of property." *Id.*

The district court in *Hoseman v. Weinschneider* also confirmed the necessity of a prepetition legal interest. *Weinschneider*, 277 B.R. at 900-01. In that case, during September and October of 1989, the debtor, Henry Weinschneider, negotiated an arrangement with two other parties whereby the parties would form a business entity called Burton to operate nursing homes. *Id.* at 897. According to the agreement, the debtor would own 23% of Burton and would receive a share of any profits made by the nursing homes. *Id.* In exchange, the debtor would continue his efforts to obtain business for Burton and teach the other parties how to operate nursing homes. *Id.* Weinschneider filed for bankruptcy on October 10, 1989. *Id.* Burton was incorporated on October 19, 1989. *Id.*

Weinschneider was never compensated by Burton, and in February 1996, he filed a state-court breach-of-contract action against the other parties to the agreement. *Id.* at 898. The trustee brought an action in bankruptcy court, seeking to have the breach-of-contract action declared property of the bankruptcy estate. *Id.* The bankruptcy court agreed. *Id.*

The bankruptcy court "reasoned that the deal with Burton was a continuation of [the debtor's] pre-bankruptcy business, and so the state court suit [was] significantly related to [the debtor's] pre-bankruptcy activities, i.e., the matters giving rise to the state court suit [were] rooted in [his] pre-bankruptcy past." *Id.* at 899 (internal quotation marks omitted). The bankruptcy court "did not hold that the contract was formed before the petition was filed, . . . only that [the debtor] participated in negotiations leading to its formation before filing." *Id.*

The district court reversed. *Id.* at 902. The court first found that for summary judgment purposes, the contract was formed after Weinschneider filed for bankruptcy. *Id.* at 900. Moreover, the bankruptcy court had erred in "applying the *Segal* 'rooted in the pre-bankruptcy past' doctrine directly without consideration of whether there was a contract." *Id.* Furthermore, neither "mere negotiations" nor "merely carrying on one's normal business activities as if one were not going to declare bankruptcy or had not declared bankruptcy create a pre-petition right to any property." *Id.* at 901. The district court further explained the role of the contract this way:

> Without a contract, there would be no prospect of any interest in a breach of contract case that had to be disclosed, and without the claim that there was a contract to breach, there would be no state court action to roll into the bankruptcy estate. Without the contract, whether it was pre-petition or post-petition,

18

> the negotiations on which the bankruptcy court bases its conclusions would by themselves have no legal effect or relevance. The pre-petition existence of the contract was crucial.

*Id.* Because Weinschneider filed for bankruptcy before the contract was formed, then, he had no prepetition cause of action that could be part of the bankruptcy estate. *Id.* Consequently, the judgment of the bankruptcy court was reversed. *Id.* at 902.

We agree with the analyses of the *Vote*, *Bracewell*, *Schmitz*, and *Weinschneider* courts. In this case, at the time of filing, Burgess had only a mere hope that crop-disaster-relief legislation would be enacted. "This sort of nebulous possibility is not property." *Schmitz*, 270 F.3d at 1257. Were the law otherwise, any postpetition legislation or contract could retroactively create property of the estate. That cannot be the law; § 541 clearly states that a bankruptcy estate is established at "[t]he commencement of [the] case." Thus, Burgess had no interest, contingent or otherwise, in the disaster-relief payment when he filed his bankruptcy petition.

### B.

The Appellees also argue that Burgess's crop loss, itself, is § 541(a)(1) property supporting the inclusion of the disaster-relief payment in the estate as proceeds under § 541(a)(6). We reject this argument.

Section 541(a)(1) defines property in terms of a legal or equitable interest in property that exists at the commencement of

19

the case.  § 541(a)(1).  For the temporal limitation to have any meaning at all, Burgess must have had a prepetition interest in the disaster-relief payment, not the crop loss.  Were Burgess's crop loss itself enough to bring the payment into the estate—notwithstanding the postpetition enactment of the 2003 Act, creating Burgess's right to the payment—the "as of the commencement of the case" language would have no force or effect.  "[A] statute must, if possible, be construed in such fashion that every word has some operative effect."  *United States v. Nordic Village Inc.*, 503 U.S. 30, 36 (1992) (quoting *Hoffman v. Conn. Dep't of Income Maint.*, 492 U.S. 96, 103 (1989)).

Furthermore, as the Eighth Circuit said in *Vote*, "[w]e have found no case in which a pure loss with no attendant potential benefit was included as property of the estate."  *Vote*, 276 F.3d at 1027.  The cases cited by the Appellees do not hold otherwise.

The Appellees cite *Milnor v. Metz*, 41 U.S. 221 (1842), and *Williams v. Heard*, 140 U.S. 529 (1891), for the proposition that a pure loss is property of the estate.  Those cases fail to support the Appellees' position for two reasons.

First, *Milnor* and *Williams*—decided in 1842 and 1890, respectively—predate the enactment of the current Bankruptcy Code by approximately 100 years.[10]  The language of the Code is

---

[10] The current Bankruptcy Code was enacted by the Bankruptcy Reform Act of 1978.  Bankruptcy Reform Act of 1978, Pub. L. No. 95-598.

our starting point today, and we find the cases interpreting §
541 more persuasive than those predating its enactment.

Second, *Milnor* and *Williams* stand for the proposition that a
prepetition loss is property of the estate *if it gives rise to a
prepetition legal claim or interest*.  In this case, Burgess's
crop loss, in and of itself, did not give him a legal claim to,
or interest in, the disaster-relief payment.

*Milnor v. Metz* involved a debtor who was an employee of the
U.S. government and whose compensation was fixed by statute.
*Milnor*, 41 U.S. at 221.  Between 1836 and 1837, Milnor worked
overtime or performed services that went beyond those in his job
description.  *Id.*  Milnor filed for bankruptcy in 1838; he was
discharged the following year.  *Id.* at 221–22.  In 1840, Congress
enacted a law compensating Milnor for the extra work he had
performed between 1836 and 1837.  *Id.* at 221.

The Supreme Court contrasted Milnor's situation with that in
*Emerson v. Hall*, 38 U.S. 409 (1839).  *Milnor*, 41 U.S. at 225–26.
Emerson, the surveyor of the Port of New Orleans, sued a slave
ship, claiming half of its proceeds and cargo.  *Id.* at 225.
Although a lower court found in favor of Emerson, its judgment
was reversed by the Supreme Court, which held that Emerson "had
no right as [a] captor[]; and that [he] stood on the footing of
an officer who made a military seizure."  *Id.*  After Emerson's
death, Congress "passed an act bestowing on his legal

21

representatives[] . . . the one-half of the condemnation money." *Id.*

Hall, a creditor of Emerson, sued the heirs' guardian for repayment of the debt out of the money awarded by Congress. *Id.* The Supreme Court ruled in favor of the heirs, holding that the "act of congress gave the money to Emerson's heirs[] as a gratuity[] because of the meritorious conduct of their father." *Id.* at 226. The Court explained that Emerson had "acted under no law, nor by virtue of any authority; his acts imposed no obligation, either in law or in equity, on the government." *Id.* (internal quotation marks omitted).

By contrast, the *Milnor* Court stated, "[t]he services performed by Milnor were at the instance of the government . . . ." *Id.* The government was therefore Milnor's debtor. *Id.* Although the repayment of the debt was within Congress's discretion, the debt existed nonetheless. *See id.* at 226–27. The Court explained that "[h]ad a similar claim on the part of Milnor existed against an individual, instead of the government, then there can be no doubt, he could have recovered by suit." *Id.* at 227. "As the government was equally bound to do its debtor justice, in a different mode, with an individual, we think no sound distinction exists in the two cases." *Id.* In other words, even though Milnor could not sue the government for the amount of the debt, the debt still existed.

Because Milnor was a creditor of the government, his case is distinguishable from Burgess's. In *Milnor*, the government was legally obligated to repay its debt to the bankrupt, even if actual payment was ultimately within Congress's discretion because the government could not be sued. In other words, sovereign immunity is not a bar to the existence of a prepetition cause of action for bankruptcy purposes. But unlike Milnor, whose claim for services was against the government, Burgess did not have a prepetition claim against the government for his crop loss. Burgess was not a creditor of the government, and Congress had no obligation to pass crop-disaster-relief legislation. Rather, the disaster-relief payments were gratuitous; thus, this case is like *Emerson*, not *Milnor*.

The other Supreme Court case discussed by the Appellees, *Williams v. Heard*, 140 U.S. 529 (1891), is similarly distinguishable. There, the debtors insured ships that were damaged in the Revolutionary War. *See id.* at 529–30. They became bankrupt in 1875; they were discharged from bankruptcy in 1877. *Id.* at 530.

In 1871, an arbitration tribunal in Geneva awarded the United States $15,500,000 as indemnity for property damage sustained by U.S. citizens during the war. *Id.* at 536–37. In 1882, a congressional act created the Court of Commissioners of Alabama Claims to adjudicate claims and distribute the money.

23

*Id.* at 531.  The issue before the Supreme Court was whether the claim for reimbursement preceded the debtors' bankruptcy or was not cognizable until the passage of the Act of 1882, which created the court that distributed the money.  *Id.* at 540.

The Court held that the claim existed before bankruptcy and was therefore property of the estate, noting,

> [T]hese war premiums of insurance were recognized by the government of the United States as valid claims for which satisfaction should be guarantied [sic].  There were thus at all times a possibility that the government would see that they were paid.  There was a possibility of their being at some time valuable.  They were rights growing out of property; rights, it is true, that were not enforceable until after the passage of the act of congress for the distribution of the fund.  *But the act of congress did not create the rights*.  They had existed at all times since the losses occurred.  They were created by reason of losses having been suffered.  *All that the act of congress did was to provide a remedy for the enforcement of the right*.

*Id.* at 541 (emphasis added).  The Appellees claim this passage stands for the proposition that a pure loss constitutes property of the estate.  Yet that interpretation cannot be reconciled with the facts.  In *Williams*, the debtors were entitled to compensation because they insured property that was damaged by Great Britain; that is, the debtors had a legal claim against someone.  If Burgess's crops had been damaged by an individual, he would have had a legal claim against that person, which would have been considered property of the estate.  But they were not.  To the contrary, Burgess's crops were damaged by an act of nature, and thus he had no claim against anyone.

24

This interpretation is buttressed by the *Williams* Court's reliance on *Comegys v. Vasse*, 26 U.S. 193 (1828). In that case, Vasse was an insurer of ships owned by U.S. citizens that were captured by Spain. *Williams*, 140 U.S. at 542. Vasse paid the losses arising prior to 1802; in 1802 he became bankrupt. *Id.*

In 1819, the United States and Spain entered into a treaty, pursuant to which Spain paid the United States $5,000,000 "in full discharge of the unlawful seizures which she had made." *Id.* at 542. Vasse was awarded $8,000 from the fund for payments he had made to the insureds. *Id.* The Supreme Court held that the money belonged to the estate because Vasse's claim had existed before bankruptcy. *Id.* at 542–43. According to the Court,

> It is not universally, though it may ordinarily be, one test of a right, that it may be enforced in a court of justice. Claims and debts due from a sovereign are not ordinarily capable of being so enforced. Neither the king of Grant [sic] Britain nor the government of the United States is suable in the ordinary courts of justice for debts due by either; yet who will doubt that such debts are rights?

*Williams*, 140 U.S. at 543 (quoting *Vasse*, 26 U.S. at 216).

*Milnor*, *Williams*, and *Vasse*, then, all involved debtors who were creditors of the government or who suffered property loss that gave rise to a legal claim. Their claims were contingent in the sense that they depended on the goodwill of the governments involved for satisfaction, but they were cognizable legal claims nonetheless. By contrast, Burgess had no legal claim arising

25

from his damaged crops when he filed his petition.  Unlike the debtors in *Milnor* and *Vasse*, he was not a creditor of the government.  And unlike the debtor in *Williams*, his property was not damaged at the hands of an individual or entity giving rise to a legal claim for reimbursement.  His crops were damaged by nature; thus, the 2003 Act conferred on Burgess both the right and the remedy.  *Cf. Williams*, 140 U.S. at 541 ("All that the act of congress did was to provide a remedy for the enforcement of the right.")  Because the Act was passed postpetition, it does not give rise to a claim that constitutes property of the estate, and the payment made pursuant to it is therefore not proceeds.

IV.

We are likewise unpersuaded by those bankruptcy and district-court cases cited by the Appellees holding that crop-disaster-relief payments are property of the bankruptcy estate. The Appellees principally rely on four such cases: *Kelley v. Ring (In re Ring)*, 169 B.R. 73 (M.D. Ga. 1993); *Boyett v. Moore (In re Boyett)*, 250 B.R. 817 (Bankr. S.D. Ga. 2000); *Lemos v. Rakozy (In re Lemos)*, 243 B.R. 96 (Bankr. D. Idaho 1999); and *FarmPro Services, Inc. v. Brown (In re FarmPro Services, Inc.)*, 276 B.R. 620 (D.N.D. 2002).  Each of these cases is distinguishable or analytically flawed.

In both *Ring* and *Boyett*, for example, the statute

26

authorizing the disaster-relief payments was enacted before the debtor filed for bankruptcy.[11]  Thus, in those cases, the debtor obtained a prepetition right to the payments that became part of his bankruptcy estate; the actual payments received were therefore proceeds of that right.

*Lemos* is weak authority for the Appellees' position.  In that case, the bankruptcy court held that disaster-relief payments were property of the estate under both § 541(a)(1) and § 541(a)(6) even though the statute authorizing the payments was not enacted until after the debtor filed for bankruptcy.  *Lemos*, 243 B.R. at 97, 101.  As the *Bracewell* court explained, however, *Lemos*'s analysis is flawed for several reasons.  *See Bracewell*, 322 B.R. at 706–08.

First, *Lemos* relied heavily on the bankruptcy court's decision in *In re Schmitz*, 224 B.R. 117 (Bankr. D. Alaska 1998), which was later reversed by the Ninth Circuit, *Schmitz v. Battley (In re Schmitz)*, 270 F.3d 1254 (9th Cir. 2001).  *Bracewell*, 322 B.R. at 706; *Lemos*, 243 B.R. at 99.

Second, the *Lemos* court's reasoning is not persuasive.  In holding that the debtor had a contingent interest in the disaster

---

[11] *See Ring*, 169 B.R. at 74 (statute authorizing payments enacted in December 1991; debtor filed for bankruptcy in January 1992); *Boyett*, 250 B.R. at 818 (statute authorizing payments enacted in October 1998; debtor filed for bankruptcy in February 1999).

payments, the court reasoned as follows:

> [I]n this case Plaintiff became entitled to the [disaster-relief] payments only as a result of qualifying events (i.e., growing and suffering qualifying losses as to certain crops) occurring before bankruptcy, rather than any significant event taking place after filing his bankruptcy petition. The scenario is a common one. Congress frequently and regularly enacts a variety of farm subsidy programs, including price supports, set-asides, and disaster relief, which change from year to year. The prospect of a federal program being adopted to compensate for farm losses in any given year may therefore be properly characterized as a contingent interest, which, though it may never vest if the program does not encompass a particular crop or a particular year, is property of the bankruptcy estate when it relates to prepetition crops.

*Lemos*, 243 B.R. at 99. The *Bracewell* court asserted, and we agree, that the *Lemos* court's contingent-interest analysis is flawed because it conflates "the contingency of receiving crop disaster payments once authorizing legislation is enacted[] [with] the mere hope that such legislation will be enacted in the first place." *Bracewell*, 322 B.R. at 706. *Bracewell* explained that "once crop disaster legislation is enacted, legally significant facts exist upon which a farmer could base a contingent right, which is the same type of contingent right contemplated under *Segal*." *Id.* at 706–07. However, the mere hope that the legislation will be enacted does not create a contingent interest in the debtor. *Id.* at 707. Were that the case, any postpetition legislation or contract could retroactively create property of the estate. To the contrary, § 541 clearly states that a bankruptcy estate is established at

28

"[t]he commencement of [the] case."

*Lemos*'s contingent-interest analysis is problematic for another reason not discussed by the *Bracewell* court. *Lemos* discusses two contingent-interest cases before concluding that the debtor's right to relief payments constituted a contingent interest: *In re Ryerson*, 739 F.2d 1423 (9th Cir. 1984), and *In re Shaw Construction, Inc.*, 92 I.B.C.R. 90 (Bankr. D. Idaho 1991). *Lemos*, 243 B.R. at 98–99. Yet in both of those cases, there was a prepetition contract giving rise to the debtor's interest. *See id.*[12] *Lemos*'s reliance on those cases, therefore, is misplaced.

Lastly, the Appellees rely on *FarmPro Services, Inc. v. Brown (In re FarmPro Services, Inc.)*, 276 B.R. 620 (D.N.D. 2002) to support their case. *FarmPro* relied exclusively on *Lemos* in

---

[12] In *Ryerson*, for example, the debtor entered into an employment contract in January 1977. *Ryerson*, 739 F.2d at 1424. The contract gave his employer the option of providing the debtor with compensation upon the termination of his employment if certain conditions precedent were met, e.g., the debtor was an employee in good standing with the company. *Id.* The debtor filed for bankruptcy in February 1981, and his employment terminated in November 1981, triggering the compensation clause under the contract. *Id.* The Ninth Circuit held that the prepetition contract had given the debtor a legal interest, though contingent, which was property within the meaning of § 541(a)(1). *Id.* at 1425. The payments made pursuant to the contract, therefore, were proceeds under § 541(a)(6). *Id.*

Similarly, in *Shaw Construction*, "a worker's compensation insurance dividend which was declared and received postpetition was found to be a contingent interest properly characterized as the property of the bankruptcy estate." *Lemos*, 243 B.R. at 99. The insurance contract, however, was entered into before the debtor filed for bankruptcy. *See Shaw Construction*, 92 I.B.C.R. at 90, 91.

29

holding that crop-disaster-relief payments authorized by legislation enacted after the debtor filed for bankruptcy are property of the bankruptcy estate under § 541(a)(6). *Id.* at 624. As discussed above, however, we are not persuaded by *Lemos*.[13]

Instead, we follow the lead of the Eighth Circuit in *Vote* and hold that Burgess did not obtain a legal interest in the disaster-relief payment until the 2003 Act was passed. At the commencement of his bankruptcy case, Burgess had only a mere hope that the legislation would be enacted. A hope will not suffice under § 541.

V.

Finally, the Appellees contend that using the effective date of the 2003 Act, rather than the crop loss itself, as the source of Burgess's interest in the disaster-relief payment will have disparate results because disaster-relief payments may be treated differently depending on when the debtor files for bankruptcy. They argue that fairness requires us to rule in favor of the

---

[13] In addition, as the *Bracewell* court pointed out, *FarmPro* reached the right result for the wrong reason. *Bracewell*, 322 B.R. at 710. The chronology of events in *FarmPro* is as follows: in September 2000, the debtors filed a Chapter 13 petition; in October 2000, Congress enacted the disaster-relief legislation; in December 2000, the case was converted from a Chapter 13 case to a Chapter 11 case; in June 2001, the debtors converted their case to a Chapter 12; in July 2001, they received the disaster-relief payments. *FarmPro*, 276 B.R. at 623. Thus, the payments were received while the debtor was in Chapter 12. *See id.* Under § 1207, therefore, the payments are property of the estate. *See supra* note 10.

30

trustee.

We decline the Appellees' invitation to rewrite bankruptcy law.  It is Congress who is charged with articulating bankruptcy policy through the Bankruptcy Code; Congress has done so, and we are bound to follow it.[14]  The judgment of the district court is therefore REVERSED.

REVERSED and REMANDED.

---

[14] The *Bracewell* court responded to a similar argument, stating,
> [Any] unfairness is largely due to the nature of federally created crop disaster payments, which are in the form of congressionally created retrospective relief. Since this relief——and the possibility of a concomitant windfall to debtors——is a creation of Congress, it should be Congress who must remedy the situation, not the courts by judicial fiat. Congress was well aware of what it was creating when it enacted the crop disaster relief legislation.  Congress could have crafted the crop disaster legislation in such a way that encompassed the rights of creditors.  It did not.  Congress could have added a provision to the Code that specifically classified retrospective government entitlements with regard to property of the estate.  It did not.  Perhaps it should.

*Bracewell*, 322 B.R. at 711.

EDITH H. JONES, Chief Judge, joined by SMITH, BARKSDALE, GARZA, DEMOSS, CLEMENT, and OWEN, Circuit Judges, dissenting from the majority opinion:

The issue posed in this case is whether federal agriculture disaster payments, enacted by Congress to compensate farmers for crops planted but destroyed by drought or flood, are included within a farmer's Chapter 7 bankruptcy estate when the federal law was enacted after the bankruptcy filing. Because we disagree with the majority's resolution of this issue, we respectfully dissent.

A debtor's bankruptcy estate comprises, inter alia, "all legal or equitable interests of the debtor in property as of the commencement of the case," and "proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(1),(6). We would hold that these definitions, whether interpreted in light of venerable bankruptcy case law or state commercial law, are sufficiently broad to encompass the disaster payments made to Burgess. Further, excluding the payments from the bankruptcy estate creates irreconcilable tension with other Bankruptcy Code provisions and goals.

# I. Background

Edward Keith Burgess is a Louisiana farmer who filed for Chapter 7 bankruptcy on August 2, 2002. He received a discharge on December 5, but entered into a reaffirmation agreement covering a debt of $59,392.32 owed to Farm Service Agency (FSA), which held a secured mortgage on Burgess's home.

On February 20, 2003, federal legislation known as the Agricultural Assistance Act of 2003 (the Act) was signed into law. The Act provided for assistance to farmers who suffered losses due to weather-related disasters or other emergency conditions which affected their 2001 or 2002 crops. Farmers became eligible to apply for disaster payments on June 21, 2003. Sometime in July, 2003, Burgess filed an application for payment of a 2001 crop loss with the FSA, which administered the Act. The FSA ultimately issued a check in the amount of $24,829 for Burgess's claimed losses, but the check was mailed to the bankruptcy trustee who, upon receipt of such check, filed a motion to reopen Burgess's Chapter 7 case in order to arrange for the administration of the proceeds of the claim check. The bankruptcy court entered an order on July 29, 2003, reopening Burgess's Chapter 7 proceeding. On July 30, 2003, Burgess filed a "Motion for Turnover of Funds" in the bankruptcy court, asserting that the FSA payment was not property of the bankruptcy estate and should therefore be turned over to him.

33

The bankruptcy court denied Burgess's motion, and the district court, on appeal, affirmed.  A panel of this Circuit then reversed, Burgess v. Sikes, 392 F. 3d 782 (5th Cir. 2004), holding that Burgess's disaster relief payments constituted postpetition property and were not part of the bankruptcy estate. This court agreed to rehear the case en banc, 403 F. 3d 323 (5th Cir. 2005).

## II.  Discussion

11 U.S.C. § 541, entitled "property of the estate," embodies the essence of the Bankruptcy Code.  Sweeping all of the debtor's property into the bankruptcy estate created at filing is the means by which the Code achieves effective and equitable bankruptcy administration.  Only through a comprehensive adminis-tration of the debtor's property, wherever located and by whomever controlled, can the court shield the property from creditors' unauthorized grasp; prevent harassment of debtors; and ultimately ensure equal distribution among creditors.  See generally 5 COLLIER ON BANKRUPTCY § 541.01(a)(1) (15th Ed. Rev. 2002).

Section 541 accordingly describes property of the estate in the broadest possible terms: "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541.01(a)(1)  "By including all legal interests, without exception, Congress indicated its intention to include all

34

legally recognizable interests although they may be contingent and not subject to possession until some future time." Rau v. Ryerson (In re Ryerson), 739 F.2d 1423, 1425 (9th Cir. 1984)(citing H.R. Rep. No. 95-595, at 175-76 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6136); see also In re Kemp, 52 F.3d 546, 550 (5th Cir. 1995) ("The conditional, future, speculative, or equitable nature of an interest does not prevent it from being property of the bankruptcy estate"); In re Yonikus, 996 F. 2d 866, 869 (7th Cir. 1993) ("[E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541(a)."). Similarly, "proceeds of the estate", § 541(a)(6), cover all conceivable postpetition returns yielded by the debtor's property. Finally, § 541 includes interests in marital property (§ 541(a)(2)), and in property acquired or generated by the estate postpetition pursuant to other sections of the Bankruptcy Code (§§ 541(a)(3) and (4)); and it sweeps in property interests, acquired within one hundred eighty days after bankruptcy, from inheritances, divorce settlements, or life insurance policies (§ 541(a)(5)).

Taken as a whole, § 541 is far more conspicuous for what it includes as the estate's property than for what it explicitly excludes. Section 541(a)(6) excludes wages earned postpetition, and § 541(a)(7) excludes divorce settlements, inheritances, and life insurance proceeds received more than one hundred eighty days postpetition. Because there is no specific

35

reference to the debtor's after-acquired payments from federal agriculture disaster programs, and Congress has not specified in this instance that such payments are immune from the claims of creditors, interpretation of the Bankruptcy Code, in light of guiding case law, is necessary.

The Supreme Court has recognized that what is included in property of the debtor's estate may represent federal policy implementing the Bankruptcy Code, Segal v. Rochelle, 382 U.S. 375, 379, 86 S. Ct. 511, 515 (1966), but in the absence of such policy, state law generally determines what interest a debtor has in property. Butner v. United States, 440 U.S. 48, 54, 99 S. Ct. 914, 917-18 (1979). We need not definitively resolve whether federal or state law controls the question in this case. See Johnson, Blakely, Pope, Bokor, Ruppel, & Burns, P.A. v. Alvarez (In re Alvarez), 224 F.3d 1273, 1276 (11th Cir. 2000). From either perspective, the federal disaster payments for which Burgess qualified should be included within his bankruptcy estate.

**A. The Bankruptcy Policy Approach.**

The Supreme Court has routinely concluded that, to fulfill the purposes of bankruptcy law, the definition of property of the debtor's estate must be broadly interpreted. See United States v. Whiting Pools, 462 U.S. 198, 103 S. Ct. 2309 (1983). In Whiting Pools, § 541(a)(1) was held to encompass property that

36

had been seized by a creditor (IRS) before the debtor filed bankruptcy. Thus, as of "the commencement of the case", the debtor no longer possessed the property. Noting that § 541(a)(1) defines the debtor's estate to include property "as of the commencement of the case," the court observed:

> although [this provision] could be read to limit the estate to those "interests of the debtor in property" at the time of the filing of the petition, we view [it] as a definition of what is included in the estate, rather than as a limitation.

Id. at 203, 103 S. Ct. at 2312. The Court found its interpretation necessary to effectuate other provisions of the Bankruptcy Code and consistent with longstanding practice under the preceding bankruptcy statute. Moreover, in both text and footnote, the Court subscribed to the "broad" definition of property referenced in the Congressional history relating to the Bankruptcy Code.[15] Id. at 203-05, 103 S. Ct. at 2312-14. The Court's interpretation of property of the estate eschews a rigid temporal limitation on § 541 (a)(1) and confirms that Congress enacted at least as broad a definition of that seminal term as

---

[15] Whiting Pools adopts the result and most of the reasoning of Judge Friendly's Second Circuit opinion in the same case. There, Judge Friendly described as "rigid" the government's narrow, though literalistic, reading of § 541(a)(1). Referring to the congressional history concerning the scope of this provision, Judge Friendly stated: "this discussion indicates that § 541(a)(1) was not intended to narrow the old Act's definition of 'property of the estate,' as the Government's reading of the statute would require, but preserve or enlarge it." United States v. Whiting Pools, Inc., 674 F.2d 144, 150 n.10 (2d Cir. 1982).

pre-existed in the Bankruptcy Act.  Congress, in turn, is presumed to have enacted the Bankruptcy Code against a background understanding of the Court's prior construction of "property of the estate."  Several earlier authorities are relevant here.

The first such case, Segal v. Rochelle, is explicitly mentioned in the legislative history of the Bankruptcy Code. See S.Rep. No. 95-989, at 82 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5868; H.R.Rep. No. 95-595, at 367 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6323.  Segal holds that an income tax refund claim based on events that predated bankruptcy but assertable only post-filing, at the end of the tax year, constituted property of the debtor's estate under the Bankruptcy Act.  The Supreme Court acknowledged the impossibility of categorically defining "property," while observing that the purposes of the Bankruptcy Act must ultimately govern.  The first purpose is to secure for creditors

> everything of value the bankrupt may possess in alienable or leviable form when he files his petition. To this end the term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.

Segal, 382 U.S. at 379, 86 S. Ct. at 515.  Because another prominent purpose of the Act is to afford a fresh start, "future wages of the bankrupt do not constitute 'property' at the time of bankruptcy, nor analogously, does an intended bequest to him or a promised gift-even though state law might permit all of these to

38

be alienated in advance." Id. at 379-80, 86 S. Ct. at 515. The Court concluded, however, that the loss carry-back refund claim in the case was "sufficiently rooted in the prebankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property' under § 70a(5)."  Id. at 380, 86 S. Ct. at 515.[16]

Segal affirms that a loss extant on the date of bankruptcy can later yield property includable in the debtor's estate, as it disavowed the lower courts' reasoning to the contrary:

> [B]oth the First and Third Circuits reasoned that prior to the year's end a loss-carryback refund claim was too tenuous to be classed as "property" which would pass under § 70a(5). . . .  Both circuits felt the result to be unfortunate, not least because the very losses generating the refunds often help to precipitate the bankruptcy and injury to the creditors, but both believed the statutory language left no option.

Id. at 378.

An earlier Supreme Court case presages Segal and is factually similar to the case at bar.  In Williams v. Heard, 140 U.S. 529 (1891), a debtor suffered economic injury by paying enhanced war risk insurance premiums during the Civil War. Although the injury was non-compensable at the time of the

---

[16] The portion of Segal's formulation that inquires whether the after-acquired property is "so little entangled with the debtor's ability to make a fresh start" is often quoted but hardly ever determinative.  The better view of this phrase is that it was eliminated by the Code's express incorporation of exempt property within the debtor's estate.  See In re Ryerson, 739 F.2d at 1426.

debtor's bankruptcy in 1875, the injury thereafter became compensable by an act of Congress in 1882. Before passage of the legislation allowing such claims, the Court stated, "no individual claimant had, as a matter of strict legal or equitable right, any lien upon the fund awarded, nor was Congress under any legal or equitable obligation to pay any claim." Id. at 538. Nevertheless, the Court found the claim to be property of the bankruptcy estate, reasoning as follows:

> . . . [W]hile the claimant was remediless with respect to any proceedings by which he might be able to retrench his losses, nevertheless there was at all times a moral obligation on the part of the government to do justice to those who had suffered in property. . . . There was thus at all times a possibility that the government would see that [the claims] were paid. There was a possibility of their being at some time valuable. They were rights growing out of property; rights it is true, that were not enforceable until after the passage of the act of congress for the distribution of the fund. But the act of congress did not create the rights. They had existed at all times since the losses occurred. They were created by reason of losses having been suffered. All that the Act of Congress did was to provide a remedy for the enforcement of the right.

Id. at 541.[17]

These cases ascribe a broad, non-conventional scope to the

_____

[17] Williams relied on Milnor v. Metz, 41 U.S. 221 (1842), in which the Supreme Court held that wages earned by a worker employed in federal service before he filed bankruptcy, but not reimbursed until an Act of Congress was passed after the bankruptcy, were included in the bankrupt estate. Absent an Act of Congress, Milnor was barred by sovereign immunity from enforcing his claim against the government. Thus, even though the government was his "debtor," he had no prebankruptcy legal right to recover wages.

definition of property of the estate in order to fulfill the goals of bankruptcy law. Thus, even a prepetition loss of the debtor's property may itself constitute property when subsequent events afford a recovery for the loss. Resolution of Burgess's case seems straightforward under <u>Whiting Pools</u>, <u>Segal</u> and <u>Williams</u>. Burgess invested in his crops, planted them and awaited a harvest until a weather-related disaster destroyed them. He suffered a loss. At the time of his loss there was "an expectancy of interest," "a possibility coupled with an interest," that the crop loss could be compensable in the future. That potential, as the Supreme Court held in <u>Williams</u>, is a property right, and under <u>Segal</u>, the right is sufficiently rooted in the prebankruptcy past as to become property of the bankruptcy estate.

The majority opinion disagrees with the foregoing interpretation of the Bankruptcy Code by the Supreme Court cases. The majority opinion focuses on the temporal limitation in § 541(a)(1), which it constructs as an iron curtain separating prebankruptcy property from whatever accrues to the debtor post-bankruptcy. The majority reads the cases to require that a prebankruptcy loss must have more than a mere hope or expectancy of recovery, and must in fact give rise to a prebankruptcy legal claim, in order for post-bankruptcy recovery for that loss to become part of the bankruptcy estate. This view has some force, but we respectfully reject its rigidity.

41

First, the majority opinion overlooks <u>Whiting Pools</u>, which construed the temporal limitation in § 541(a)(1) as a statement of inclusion, not limitation.

Second, the majority both minimizes and reinterprets <u>Segal</u>. <u>Segal</u> expressly holds that a prebankruptcy loss can give rise to a claim that becomes property of the debtor's estate. The majority opinion minimizes <u>Segal</u>, implying that its formulation has been superseded by the express terms of the Bankruptcy Code. There is little or no support for this conclusion.[18] Not only was the holding of <u>Segal</u> approved in the legislative history concerning § 541, <u>see</u> <u>supra</u>, but its test to determine when after-acquired property is included in the bankruptcy estate has been cited repeatedly by courts construing the Bankruptcy Code.[19]

---

[18] The majority opinion cites only dictum in a case from this court that the Supreme Court overruled. <u>In re Goff</u>, 706 F.2d 574, 578 (5th Cir. 1983), <u>overruled by</u> <u>Patterson v. Shumate</u>, 504 U.S. 753, 112 S. Ct. 2242 (1992). <u>In re Goff</u> actually concluded that the Bankruptcy Code broadened any pre-existing test for property of the debtor's estate. ("The Bankruptcy Code was intended to create a more uniform and comprehensive scope to 'property of the estate' which is subject to the reach of debtors' creditors than had previously existed under the old Bankruptcy Act. . . . The sweeping scope of [the § 541(a)(1)] automatic inclusion was intended to remedy most of the old Act's perceived deficiencies.")

[19] <u>See, e.g.,</u> <u>In re Alvarez</u>, 224 F.3d 1273, 1278-79 (11th Cir. 2000); <u>United States v. Sims</u> (<u>In re Feiler</u>), 218 F.3d 948, 955-56 (9th Cir. 2000); <u>Andrews v. Riggs Nat'l Bank of Wash., D.C.</u> (<u>In re Andrews</u>), 80 F.3d 906, 910 & n.9 (4th Cir. 1996) (analyzing postpetition payments under a prepetition non-competition agreement to determine whether they were, as <u>Segal</u> requires, "sufficiently rooted in the pre-bankruptcy past"); <u>In re Yonikus</u>, 996 F.2d 866, 869 & n.3 (7th Cir. 1993); <u>In re</u>

The majority opinion also misperceives <u>Segal</u> to require that the debtor had an enforceable legal right prebankruptcy in order for a post-bankruptcy claim to accrue to the debtor's estate. <u>Segal</u> expresses no such requirement.  The Supreme Court did, however, emphasize the contingent nature of any repayment that the debtor might ultimately receive and the origin of any tax refund in prebankruptcy events.  <u>Segal</u>, 382 U.S. at 379-81, 86 S. Ct. at 515-16.[20]  Both of those conditions exist in the case before us, and in other cases that rest on <u>Segal</u>.

While it is indisputable, for instance, that a cause of action belonging to the debtor at the date of bankruptcy constitutes property of the estate, notwithstanding that its monetary realization may be subject to both legal and factual contingencies, <u>see, e.g.</u>, <u>La. World Exposition, Inc. v. Fed. Ins. Co.</u> (<u>In re La. World Exposition</u>), 832 F.2d 1391 (5th Cir. 1987),

---

<u>Ryerson</u>, 739 F.2d 1423, 1426 (9th Cir. 1984); <u>In re Barowsky</u>, 946 F.2d 1516, 1518-19 (10th Cir. 1991) (<u>Segal</u>'s holding and analysis of property were adopted in the Bankruptcy Code); <u>Field v. Transcontinental Ins. Co.</u>, 219 B.R. 115, 199 & n.7 (E.D. Va. 1998), <u>aff'd</u>, 173 F.3d 424 (4th Cir. 1999); <u>Winick & Rich, P.C. v. Strada Design Assocs.</u> (<u>In re Strada Design Assocs.</u>), 326 B.R. 229, 236 (Bankr. S.D.N.Y. 2005); <u>In re Richards</u>, 249 B.R. 859, 861 (Bankr. E.D. Mich. 2000).

[20] The majority opinion also asserts that <u>Williams</u> involved compensation for a pre-bankruptcy legal right or claim "against someone."  With due respect, the Supreme Court emphasized the contrary, that no legal or equitable right existed against Congress or the international fund that was earlier collected. <u>Williams</u>, 140 U.S. at 538.  Further, because the rights grew out of the debtor's property, by reason of losses having been suffered, the later-enacted Congressional remedy became part of the bankruptcy estate.

bankruptcy courts relying on Segal have gone further. Courts have held that a cause of action not fully accrued under state law at the date of filing could be sufficiently rooted in the prebankruptcy past to be includable in the debtor's estate. In one such case, the debtor was exposed to asbestos for many years before he filed bankruptcy but was not diagnosed with asbestosis until seven months postpetition. See In Re Richards, 249 B.R. 859 (Bankr. E.D. Mich. 2000). Relying on Michigan law, which does not afford an actionable claim for asbestosis until the diagnosis is actually made, the debtor asserted that the accrual date under state law is determinative, hence his claim should be excluded from the bankruptcy estate. The court rejected this contention, because, "[a]s noted, the appropriate inquiry is whether the claim is sufficiently rooted in the pre-bankruptcy past." Id. at 861 (citing Segal). Richards explained that while the disease had begun and progressed before bankruptcy, its diagnosis afterwards was "more a result of happenstance than medical necessity." Id.

Another recent case ordered inclusion in the bankruptcy estate of a claim for bad faith refusal to defend an insured, where notice of the underlying insurance claim was given prepetition, but the debtor did not request, nor did the insurer refuse indemnification until more than eight months postpetition. Field v. Transcontinental Ins. Co., 219 B.R. 115, 119 (E.D. Va. 1998), aff'd, 173 F.3d 424 (4th Cir. 1999). The district court

44

acknowledged as a "difficult question" whether the debtor had any

prepetition cause of action.  The court, however, found it

unnecessary to resolve the question "because the bankrupt's

estate includes not only claims that had accrued and were ripe at

the time the petition was filed, but also those claims that

accrued post-petition, but that 'are sufficiently rooted in the

pre-bankruptcy past.'"  Id. (quoting Segal).  The postpetition

bad faith refusal claim met this test.

As a final example, claims for legal malpractice rendered in

connection with bankruptcy filings have been held includable in

the debtor's estate based on the Segal formulation and

irrespective of whether they had technically accrued prepetition

under state law.  See In re Alvarez, 224 F. 3d at 1276; Winick &

Rich, P.C. v. Strada Design Assocs. (In re Strada Design

Assocs.), 326 B.R. 229 (Bankr. S.D.N.Y. 2005); In re Tomaiolo,

205 B.R. 10 (Bankr. E.D. Mass. 1997), aff'd, 2002 U.S. Dist.

LEXIS 2038 (E.D. Mass. Feb. 6, 2002).[21]

In all of the foregoing cases, Segal was brought to bear

---

[21] In re Riccitelli, 320 B.R. 483 (Bankr. E.D. Mass. 2005),
is not to the contrary.  Indeed, the Riccitelli court applied
Segal and explicitly noted that the analysis of whether a
malpractice claim is prepetition property "does not turn on
whether, under state law, the claim had accrued as of the
petition date." Riccitelli, 320 B.R. at 491 (citing Tomaiolo).
The court concluded that this particular malpractice claim was a
postpetition asset only because the prepetition roots of the
claim were "overwhelmed by significant postpetition events in the
accrual of the claim." Id. at 492.

despite the absence of a mature legal claim at the date of bankruptcy, yet each claim was so factually connected to the prepetition period as to justify its inclusion in the debtor's estate.[22]

One court of appeals decision supports the view that federal disaster payments authorized by legislation that post-dates a farmer's bankruptcy do not become property of the debtor's estate. Drewes v. Vote (In re Vote), 276 F.3d 1024 (8th Cir. 2002). There, the court held that the debtor's "mere hope" of receiving federal payments at the date of filing could not transform his losses into a legally enforceable claim or the subsequent disaster relief payments into property of the bankruptcy estate. Id. at 1026-27. Vote mistakenly interpreted Segal to depend on the debtor's pre-existing legal right to a tax refund rather than on the facts that rooted the debtor's claim sufficiently in the prebankruptcy past. Further, Vote failed to cite Williams or Whiting Pools, and it declined to address, as waived, whether the payments could represent proceeds of the crop loss pursuant to § 541(a)(6).[23]

_____

[22] The majority opinion heavily relies on the district court opinion in Hoseman v. Weinschneider, 277 B.R. 894 (N.D. Ill. 2002), but the circuit court, in affirming the judgment, pointedly refused to "consider such intricate questions of timing," 322 F.3d 468, 473 (7th Cir. 2003). The status of the district court discussion is thus dubious.

[23] The majority opinion also relies on Sliney v. Battley (In re Schmitz), 270 F.3d 1254 (9th Cir. 2001), but that case is

46

Both Vote and the majority opinion share the view that where a debtor has only a "mere hope" (prepetition) of receiving federal payments based on statutes enacted post-bankruptcy, that hope is too nebulous or contingent to be treated as property of the debtor's estate. The majority opinion states: "were the law otherwise, any post petition legislation or contract could retroactively create property of the estate," thus eviscerating the temporal limitation in § 541(a)(1). We disagree. Whiting Pools specifically de-emphasizes the temporal limitation on § 541(a)(1). Further, Segal's formulation ensures that later-generated property will be included in the debtor's estate only if it is "sufficiently rooted in the pre-bankruptcy past." The cases described above demonstrate that Segal effects no transformation of the Bankruptcy Code, but, like Whiting Pools, allows a principled and pragmatic inclusion of property generated largely by events predating bankruptcy. Segal readily applies to disaster payments for which Burgess would have had no claim at all but for (1) prebankruptcy investment of his money and labor to plant and tend the crops; (2) the connection between the disaster payments and the crop-related debts and losses that

---

readily distinguishable. Schmitz concerned whether fishing rights allocated to a debtor post-petition, but calculated according to his prepetition catch, were property of the estate. The court sensibly held that the fishing rights were not referable to the debtor's prepetition status. The newly allocated catch permit had nothing to do with the debtor's prepetition investment or losses.

47

played a significant role in precipitating his bankruptcy; and (3) Congress's correlation of disaster payments to estimated crop proceeds that would assist farmers to repay their local creditors. Finally, placing these payments in Burgess's bankruptcy estate prevents his receiving a fortuitous windfall unavailable to other farmers who failed to file bankruptcy until after the law was passed.[24]

The disaster payments may alternatively be characterized as "proceeds" "of or from" the lost crops under § 541(a)(6). There is no temporal limitation on proceeds that accrue to the bankruptcy estate.[25] Interpreting "proceeds" broadly follows the Code's legislative history, which describes this term as broader than the U.C.C. definition. See 5 COLLIER ON BANKRUPTCY,¶ 541.17,

---

[24] The fear has been expressed that if Burgess's federal disaster payments are "sufficiently rooted in the prebankruptcy past" to require inclusion in his bankruptcy estate, then a hypothetical post-bankruptcy gift from "Aunt Minnie" to compensate Burgess in hard times would also accrue to the estate. This analogy fails for three reasons. First, while Segal does not mandate a prepetition legally enforceable right, both Segal and its lower court progeny all exhibit an ultimate legal right plus facts rooted in the prebankruptcy past. A gift from Aunt Minnie, whatever its motive, does not belong to Burgess under any claim of right. Second, § 541(a)(5) brings within the debtor's estate property acquired within six months postpetition by bequest, devise or inheritance. Gifts are similar to bequests but, because there is no mention of gifts in § 541(a)(5), must be presumed to have been excluded from the estate. Third, there is no theory of law under which a gift can be proceeds pursuant to § 541(a)(6).

[25] More will be said about "proceeds" later, as some states' laws unequivocally so classify federal disaster payments.

at § 541.90 (". . . [T]he scope of 541(a)(6) is not limited to [the U.C.C.] definition and will extend beyond it."). The majority opinion rejects the proposition that relief payments could represent proceeds of the lost crops because, "for the [§ 541(a)(1)] temporal limitation [on estate property] to have any meaning at all, Burgess must have had a prepetition interest in the disaster relief payment, not the crop loss." This view is vulnerable for several reasons. First, § 541(a)(6) requires only that proceeds be "of or from" property of the estate. The statutory language suggests no more than a but-for connection of the proceeds to the prebankruptcy estate, a connection clearly present in this case. Further, in connecting proceeds to "property of the estate", § 541(a)(6) sweeps in, conspicuously without any temporal limitations, not only property included under § 541(a)(1) but other estate property defined in all the other pertinent subsections of § 541(a). The majority interpretation thus unnaturally constrains § 541(a)(6). Finally, the majority interpretation goes against common sense. A crop loss is quantifiable. The federal disaster payments to Burgess reimbursed him for the crop loss according to its putative market value. Farm Service Agency, Agricultural Assistance Act of 2003 (Apr. 2003), http://www.fsa.usda.gov/pas/publications/facts/ html/disasact03a.htm. The payments are a functional substitute for the proceeds that Burgess could have earned from selling the crops. That there was no extant legal vehicle to recover

disaster payments when bankruptcy was filed does not render the payments a gratuity, especially where, had bankruptcy been filed post-enactment of the statute, the payments would clearly have been proceeds.

The majority opinion relies heavily on recent decisions that, following Vote, refused to include federal disaster payments in the bankruptcy estate. See, e.g., Bracewell v. Kelley (In re Bracewell), 322 B.R. 698 (M.D. Ga. 2005). Earlier cases, however, including several overlooked by Vote and Bracewell, tended to conclude that disaster payments are proceeds of lost crops under § 541(a)(6) and under the U.C.C.. See, e.g., In re Schneider, 864 F.2d 683, 685 (10th Cir. 1988) (agricultural entitlement payments arising from lost crops "are proceeds of that crop" under § 541(a)(6)). Schneider discussed In re Schmaling, 783 F. 2d 680, 682-83 (7th Cir. 1986), in which the appeals court, ruling in a bankruptcy context, explained that federal disaster payments, for crops that were planted but thereafter lost, constitute proceeds under former U.C.C. § 9-306(2) (now set forth in revised U.C.C. § 9-315). Schmaling, in turn, relied on In re Kruse, 35 B.R. 958 (Bankr. D. Kan. 1983) and In re Nivens, 22 B.R. 287 (Bankr. N.D. Tex. 1982), both of which included disaster payments within the bankruptcy estate as

"proceeds."[26]  The majority opinion dismisses two other cases

holding that crop disaster payments are proceeds under

§ 541(a)(6) on the basis that in each of them, the authorizing

legislation passed Congress before the debtor declared

bankruptcy.  Kelley v. Ring (In re Ring), 169 B.R. 73 (Bankr.

M.D. Ga.), aff'd, 160 B.R. 692 (M.D. Ga. 1993); Boyett v. Moore

(In re Boyett), 250 B.R. 817, 822 (Bankr. S.D. Ga. 2000).  Ring

does not turn on the enactment date of the disaster payment

program.  Boyett relies on both § 541(a)(1) and (a)(6), and

mentions the statute's date of passage as an element, but not a

prerequisite of its conclusion.  Further, In re White, No. BRL88-

00971C, 1989 WL 146417 (Bankr. N.D. Iowa Oct. 27, 1989), included

in the debtor's estate disaster payments authorized by statute

postdating the bankruptcy.  See also FarmPro Servs., Inc. v.

Brown (In re FarmPro Servs.), 276 B.R. 620 (D.N.D. 2002)

(disaster payments are proceeds under § 541(a)(6)).[27]

Construing property of the estate and proceeds broadly under

federal law accords with Whiting Pools, Segal, and Williams and

_____

[26] Another case often cited in this connection is Matter of
Munger, 495 F.2d 511 (9th Cir. 1974), which broadly and with
common sense interpreted federal  set aside payments as
"proceeds" of sugar beet crops.  Id. at 513.

[27] The majority asserts that the FarmPro court "reached the
right result for the wrong reasons" and relies on the case's
posture in bankruptcy, not discussed by the court, rather than on
its own reasoning that held disaster payments includable in the
debtor's estate as proceeds under § 541(a)(6) of lost crops by
means of post bankruptcy legislation.

51

yields the conclusions that Burgess's lost crops were "property";
his claim for disaster payments was rooted in the prebankruptcy
past by its tie to the lost crops; and the payments are
"proceeds" of the crops.

## B.    State Law Approach

Because property interests are ordinarily created and
defined by state law, the Supreme Court has declared:

> Unless some federal interest requires a different
> result, there is no reason why such interest should be
> analyzed differently simply because an interested party
> is involved in a bankruptcy proceeding.  Uniform
> treatment of property interests by both state and
> federal courts within a State serves to reduce
> uncertainty, to discourage forum shopping, and to
> prevent a party from receiving "a windfall merely by
> reason of the happenstance of bankruptcy.

Butner v. United States, 440 U.S. 54, 55, 99 S. Ct. 914, 918

(1979)(internal citation omitted); see also Barnhill v. Johnson,

503 U.S. 392, 398, 112 S. Ct. 1386, 1389 (1992)(in the absence of

any controlling federal law, "property" and "interests in

property" are creatures of state law  (citing Butner)); Nobelman

v. Am. Sav. Bank, 508 U.S. 324, 113 S. Ct. 2106 (1993).  Whiting

Pools, Williams, and Segal are not inconsistent with Butner;

rather than create property interests, those cases attributed

them to the bankruptcy estate as a matter of federal law.

Viewing this case solely through the lens of state law affords

another, narrower ground of decision, as the question under

Butner is whether Louisiana law treats federal disaster payments

as proceeds of lost crops.  The majority opinion overlooks the

Butner approach, yet because of Butner, the interpretation of

proceeds in § 541(a)(6) cannot be narrower than that promulgated

in state law.

Although there is no case law on point in Louisiana, the

state's version of the U.C.C. provides:

> (64) "proceeds" means the following property:
>
>> (A)  Whatever is acquired upon the sale,
>>      lease, license, exchange, or other
>>      disposition of collateral;
>>
>> . . .
>>
>> (D)  to the extent of the value of
>>      collateral, claims arising out of the
>>      loss . . . or damage to, the collateral
>>      . . . .

LA. REV. STAT. ANN. §10:9-102 (a)(64).  Thus, in Louisiana,

"proceeds" include whatever is received from a sale or other

disposition of collateral, as well as claims arising out of the

loss or damage to the collateral.  Moreover, in Finova Capital

Corp. v. IT Corp., 774 So. 2d 1129, 1131-32 (La. Ct. App. 2000),

a state court of appeals interpreted "proceeds" by reference to a

U.C.C. comment that under the provision's "plain meaning," a

security interest would also "extend . . . any rights arising out

of the collateral and any claims brought by the debtor for

damages to the collateral."[28]  Id. at 1131-32.

---

[28] Finova went on to conclude, however, that the U.C.C. does
not create  an independent cause of action for a secured party
against third-party use of collateral.  Finova, 774 So. 2d at

An established body of case law treats the U.C.C. definition of proceeds as including federal disaster payments for lost crops.[29] These decisions pragmatically recognize that such payments represent "compensation for already existing plants that had been cultivated through the recipient's effort." In re Schmaling, 783 F. 2d 680, 683 (7th Cir. 1986); see also In re Schneider, 864 F.2d 683 (10th Cir. 1988); In re Boyett, 250 B.R. 817, 822 (Bankr. S.D. Ga. 2000); In re White, No. BRL88-00971C, 1989 WL 146417 (Bankr. N.D. Iowa Oct. 27, 1989); In re Kruse, 35 B.R. 958 (Bankr. D. Kan. 1983); ConAgra, Inc. v. Farmers State Bank, 602 N.W.2d 390 (Mich. App. 1999). A Texas bankruptcy case, frequently cited in this connection, explained that, "the disaster payments are merely the substitute proceeds of the crop which logically would have been received had the disaster or low yields not occurred." In re Nivens, 22 B.R. 287, 291 (Bankr. N.D. Tex. 1982). Nivens's reasoning was adopted by the Texas Supreme Court in O'Brient v. Sweetwater Prod. Credit Ass'n, 764 S.W. 2d 230 (Tex. 1988)(holding payment in kind contracts are "proceeds").[30]

---

1132.

[29]This definition formerly appeared at § 9:316 of the U.C.C. and was renumbered, without substantive change, when Article 9 was revised.

[30] This court in Rolling Plains Prod. Credit Ass'n v. Cook (In re Cook), 169 F.3d 271, 277 (5th Cir. 1999) acknowledged the O'Brient holding that federal payments can be U.C.C. proceeds.

54

The conclusion of these courts that federal disaster payments constitute U.C.C. proceeds is not universally accepted, but it is the dominant view. See In re Ladd, 106 B.R. 174 (Bankr. C.D. Ill. 1989) (disaster payments are not U.C.C. proceeds of lost crops); In re Farm Pro Servs, 276 B.R. at 626. See generally Hon. John K. Pearson & Sally Fisher, Revised Article 9 and Government Entitlement Programs, ABI Journal, Oct. 22, 2003, at 24.[31] A reasonable extrapolation based on the text of the U.C.C., and these other courts' views, is that Louisiana would hold federal disaster payments to be crop proceeds. That being the case, under Butner, they are includable in the bankruptcy estate pursuant to § 541(a)(6).

## C. Other Bankruptcy Provisions.

If disaster payments legislated after bankruptcy are neither property of the debtor's estate because of the "temporal" limitation in § 541(a)(1), nor proceeds pursuant to § 541(a)(6), but are defined in state law as proceeds, absurd consequences could ensue for both debtors and creditors. The majority's view leads to the conclusion that the unsecured creditors would have no interest in such proceeds under the Bankruptcy Code; the trustee could not administer the recovery and division of such

---

[31] This article comprehensively surveys state cases respecting disaster payments as proceeds. See also Boyd J. Peterson, Secured Transactions: Government Agricultural Payments as "Proceeds" of Agricultural Products under U.C.C. § 9-306, 79 ALR 4th 903 (1990).

"proceeds;" and a secured creditor would not have to abide by the Bankruptcy Code's automatic stay and prohibition on interference with the debtor's discharge.

On the debtor's side, the lien creditor of a farmer with an interest in proceeds, which is enforceable in state law on disaster payments irrespective of when the legislation was passed, could claim that the interest is outside the bankruptcy estate altogether and could garnish the debtor's receipt of such payments. The garnishment would, however, run contrary to the intent of the Bankruptcy Code to free the debtor from such post-filing interferences and credit-ruining activities. See 11 U.S.C. § 362 (automatic stay); § 524 (effects of discharge). On the creditor's side, 11 U.S.C. § 552, designed to regulate the postpetition effect of prepetiton security interests, would be thrown into uncertainty by a holding that federal disaster proceeds are not within the bankruptcy estate at all. Section 552(b)(1) states that a security interest in postpetition proceeds remains enforceable if "applicable non-bankruptcy law" authorizes a security interest in such proceeds, and those "proceeds" are "acquired by the estate after commencement of the case." The majority position would hold, to the contrary, that disaster payments arising from postpetition legislation could not be "acquired by the estate" because they were never related to the debtor's estate property. At a minimum, however, the treatment of proceeds in § 552 must set a floor for the

definition of proceeds as estate property in § 541(a)(6).

In sum, federal disaster payments cannot be both fish and fowl for bankruptcy purposes. They are either "proceeds" for all purposes, at least in those states which have classified them as such under the U.C.C., or they are simply covered under the breadth of § 541(a)(6) as proceeds because Congress intended the definition to be at least as broad as that of the U.C.C. The majority view creates intolerable tension with other Bankruptcy Code provisions.

For these reasons, we respectfully **DISSENT** from the majority opinion reversing and remanding the judgment of the bankruptcy and district courts holding that the federal disaster payments designated to Burgess on account of his crop losses before bankruptcy were includable within the bankruptcy estate pursuant to 11 U.S.C. §§ 541(a)(1) and (6).